CITY OF LOS ANGELES, et al., Plaintiffs,

v.

COUNTY OF KERN, et al., Defendants.

No. CV 06–5094GAF(VBLX).

United States District Court, C.D. California.

Nov. 20, 2006.

Los Angeles City Attorney's Office, Rockard J. Delgadillo, City Attorney,

Christopher M. Westhoff, Assistant City Attorney, Keith W. Pritsker, Deputy City Attorney, Los Angeles, CA, for Plaintiff City of Los Angeles.

Bingham McCutchen LLP, James J. Dragna, Thomas S. Hixson, Marc R. Bruner, Los Angeles, CA, Beveridge & Diamond P.C., James B. Slaughter, Gary Smith, Washington, DC, for Plaintiffs City of Los Angeles, Responsible Biosolids Management, Inc., R & G Fanucchi, Inc., and Sierra Transport, Inc.

Lewis Brisbois Bisgaard & Smith LLP, Daniel V. Hyde, Paul J. Beck, Los Angeles, CA, for Plaintiff County Sanitation District No. 2 of Los Angeles County.

Woodruff Spradlin & Smart, Bradley R. Hogin, Orange, CA, for Plaintiff Orange County Sanitation District.

Law Offices of Michael J. Lampe, Michael J. Lampe, Visalia, CA, for Plaintiffs Shaen Magan, Honey Bucket Farms, Tule Ranch/Magan Farms and Western Express, Inc.

Somach Simmons & Dunn, Roberta L. Larson, Jonathan Schutz, Sacramento, CA, for Plaintiff California Association of Sanitation Agencies.

Kern County Counsel's Office, Bernard C. Barmann, Sr., County Counsel, Bakersfield, Hogan Guiney Dick LLP, Michael M. Hogan, San Diego, CA, for Defendants County of Kern and Kern County Board of Supervisors.

## ORDER RE: PRELIMINARY INJUNCTION

FEESS, District Judge.

## I.

## INTRODUCTION

Plaintiffs have filed motions for preliminary injunctions against enforcement of Measure E, a ballot initiative enacted by Defendants Kern County and Kern County Board of Supervisors (collectively "Kern") after a campaign that Included entreaties to keep "Los Angeles" sludge out of Kern County, and with a stated purpose of guarding against a "loss of confidence" in Kern County agricultural products. Measure E is Kern's third—and most stringent—attempt since 1998 to regulate the land application of sewage treatment residues called "sludge" or "biosolids," a practice in which Plaintiffs are directly or indirectly engaged. While earlier regulations limited the pathogen content of biosolids that could permissibly be applied to land, Measure E bans land application outright.

The Court concludes the outright ban is likely to impermissibly discriminate against interstate commerce because it was enacted in part for the purpose of protecting the reputation of Kern's agricultural products and specifically to exclude out-of-county biosolid commerce. Measure E is also likely to be preempted by state law because it thwarts recycling activities specifically promoted by the California Integrated Waste Management Act ("CIWMA"). It is also likely to constitute an invalid exercise of police power because it cannot reasonably be said to accommodate the regional interest in safe, cost-effective management of biosolids.

Additionally, the ban would cause Plaintiffs irreparable harm should the injunction not issue: damages would be inadequate to compensate for the government Plaintiffs' costs of procuring alternative disposal methods and also for the business that would likely be lost by the private Plaintiffs. Moreover, the public interest favors an injunction because shifting the biosolids currently applied to land in Kern County would have detrimental environmental effects, while there is no indication that the land currently in use has been harmed by the practice. In short, while applying sewage sludge to agricultural land may provoke a visceral response in

lay observers, the available evidence suggests that the practice has been undertaken safely throughout the United States without any indication of detrimental environmental or health impacts, and indeed is the most environmentally sound method of managing the material.

Thus, as discussed in greater detail below, the motions are hereby **GRANTED**.

## II.

## BACKGROUND

### A. OVERVIEW OF BIOSOLIDS

EPA regulations define "sewage sludge," also referred to as "biosolids," as the "solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in a treatment works." 40 C.F.R. § 503.9(w). Municipalities typically dispose of sewage sludge in one of three ways, one of which is the "land application" of the sludge. "Land application" means the spraying, spreading or other placement of biosolids onto the land surface, the injection of biosolids below the surface, or the incorporation of biosolids into the soil. *Id.* § 503.9(h). In 2003, the EPA estimated that approximately 60 percent of sewage sludge nationwide was treated and applied to farmland; of the remaining 40 percent, 17 percent was buried in landfills, 20 percent was incinerated, and 3 percent was used as landfill or mine reclamation cover. 68 Fed.Reg. 68817 (Dec. 10, 2003).

Part 503 of the relevant EPA regulations differentiates between Class A and Class B sewage sludge depending on the concentration of disease causing micro-organisms (pathogens) remaining after treatment. *See* 40 C.F.R. § 503.32. While Class A sewage sludge is sufficiently treated to essentially eliminate pathogens, Class B sewage sludge is treated only to substantially reduce them. *See Id.* For these reasons, the requirements for, and restrictions placed on, land application of Class B sewage sludge are more stringent than those imposed on Class A sewage sludge.

### B. THE PARTIES

Plaintiffs are local government entities, private businesses, and individuals that apply biosolids to land in Kern County. The government Plaintiffs—City of Los Angeles ("the City"), Orange County Sanitation District ("OCSD"), and County Sanitation District No. 2 of Los Angeles ("LACSD")—generate biosolids, some portion of which is transported to Kern County and applied to land there by the private Plaintiffs.

Since 1994, the City has applied its biosolids to a 4,700 acre piece of land near Bakersfield called "Green Acres," which it purchased in 1999. Green Acres is a functioning farm that mainly grows crops used for animal feed. (Minamide Decl. ¶¶ 20, 23, 27; Johnson Decl. ¶ 7.) The City's Green Acres program is administered by Plaintiff Responsible Biosolids Management, Inc. ("RBM"), which has been under contract with the City since 1996. (Stockton Decl. ¶ 8.) RBM subcontracts some amount of the hauling responsibilities to Plaintiff Sierra Transport, Inc. (Lutrel Decl. ¶ 4.) Plaintiff R & G Fanucchi, Inc. performs the farming at Green Acres and has contracted with Los Angeles since 2003 to land apply a minimum of 200,000 tons of biosolids there each year. (Fanucchi Decl. ¶ 3.)

OCSD and LACSD ship biosolids to a 4,000 acre site near the Kern and King County border known as "Tule Ranch" (also called "Honeybucket Farms"), which comprises 44% of the 9,000 total acres Kern has permitted for Class A biosolids application, and is owned by Plaintiff Shaen Magan (Magan OCSD Decl. ¶¶ 1, 6.) Plaintiff Western Express—which is owned by the Magan family—ships the

biosolids to Tule Ranch. (Magan Decl. ¶ 4.)

Plaintiff California Association of Sanitation Agencies is an organization that represents local entities engaged in waste management.

### C. KERN'S REGULATION OF BIOSOLIDS PRIOR TO MEASURE E

Kern began regulating land application of biosolids in 1998, when it required that the biosolids meet the standards set forth in the Code of Federal Regulations for Class A and Class B biosolids. *County Sanitation Dist. No. 2 of L.A. County v. County of Kern*, 127 Cal.App.4th 1544, 1568, 27 Cal.Rptr.3d 28 (Ct.App.2005) ("*County Sanitation*").

In 1999, Kern strengthened its prior regulations by adopting an ordinance that phased out the land application of Class B biosolids over a three-year period. And after the three-year phase-out, the 1999 ordinance allowed only "exceptional quality" ("EQ") biosolids, which meet the pathogen reduction requirements of Class A biosolids and contain very low levels of other pollutants, like heavy metals. *Id.* at 1568 n. 34, 27 Cal.Rptr.3d 28; 40 C.F.R. 503.13(b)(3).

After mounting an ultimately unsuccessful challenge to the 1999 ordinance, the City invested over $15 million to upgrade its sewage treatment facilities to meet Kern's new requirements. (Minamide Decl. ¶ 22.) LACSD also invested in new facilities (Stahl Decl. ¶ 13), and OCSD incurred additional costs as well (*see* Ghirelli Decl. ¶¶ 5–6).

### D. MEASURE E

On July 11, 2006, Kern declared that voters in the June 6, 2006 election had adopted the ballot initiative known as Measure E. (Compl. Ex A [Measure E] at 33.) Measure E prohibits the land application of all biosolids in the unincorporated areas of Kern County due to what it describes as "numerous serious unresolved issues about the safety, environmental effect, and propriety" of the practice, even when the biosolids are applied in conformance with federal and state regulation. (*Id.* §§ 8.05.10; 8.05.020; 8.050.40(A).)

Violations of the ordinance constitute misdemeanors punishable by fines and imprisonment. (*Id.* § 8.05.060.) Although Measure E became effective upon adoption on July 21, 2006, it gave preexisting permit holders six months to discontinue land application of biosolids. (*Id.* § 8.05.040(A).) Existing permit holders thus may continue to land apply biosolids until at least January 21, 2007. Additionally, Plaintiffs City of Los Angeles and RBN have received discretionary extensions from Kern Officials that enable them to continue land application until April 21, 2007. (Price Decl., Ex. A.)

### III.

### DISCUSSION

### A. THE LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

█ The purpose of a preliminary injunction is to preserve the status quo pending resolution of plaintiffs' substantive claims. In the Ninth Circuit, preliminary injunctive relief is appropriate "where plaintiffs demonstrate either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in their favor." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir.2006). Additionally, the public interest must favor issuance of the injunction. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917 (9th Cir.2003) (en banc). "This analysis creates a continuum: the less certain the . . . success on the merits, the more plaintiffs must [demonstrate] . . . that the public

interest and balance of hardships tip in their favor." *Id.*

■ The burden on the moving party is particularly heavy where, as here, granting the preliminary injunction would give the movant substantially the same relief it would obtain after a trial on the merits. William W. Schwarzer, et al., *California Practice Guide, Federal Civil Procedure Before Trial* § 13:79.10, at 13–40 (2005) (citing *Rivera–Vega v. ConAgra, Inc.,* 70 F.3d 153, 164 (1st Cir.1995); *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 486 (8th Cir.1993)).

## B. ANALYSIS

### 1. PLAINTIFFS DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

As discussed below, while Plaintiffs fail to raise even a serious question on their equal protection claim, their Commerce Clause, state preemption, and police power claims are likely to succeed.

### a. Equal Protection

■ As the Supreme Court has stated, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Such a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns. Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Indeed, those attacking the rationality of such a classification have the burden "to negative every conceivable basis which might support it." *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)).

■ Here, Plaintiffs have not demonstrated a likelihood of success or even a serious question on their claim that the distinction between biosolids (which Measure E prohibits) and manure and other fertilizers (which it does not) violates the Equal Protection Clause. "Evils in the same field may be of different dimensions and proportions, requiring different remedies.... Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute ...." *FCC,* 508 U.S. at 316, 113 S.Ct. 2096. Plaintiffs do not seriously contend otherwise. Their argument in favor of the equal protection claim consists of a single sentence that states the classification and closes with citations to *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) and *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), two cases that are often cited for the proposition that bare animus does not constitute a rational basis. Presumably, Plaintiffs mean to argue that the animus against Los Angeles and Los Angeles County displayed in the initiative campaign was irrational. But *Cleburne* and *Romer* do not require that each and every motive behind an enactment be rational. "Although such biases [as negative attitudes and fear] may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make." *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Thus, the fact that Measure E apparently was motivated in part by animus—as discussed in further detail below—is not fatal for equal protection purposes, so long as that animus was accompanied by other plausible, legitimate legislative goals.

On this record, such legitimate goals exist. Among Measure E's stated purposes is guarding public health against "numerous serious unresolved issues about the safety ... of land applying biosolids or

sewage sludge, even when applied in accordance with federal and state regulations." (Compl. Ex. A [Measure E] § 8.05.10.) Certainly the public health concern is legitimate, and it is rationally furthered by a ban on biosolids, particularly in light of evidence of "persistent uncertainty about the potential for adverse human health effects from exposure to biosolids," and that the relevant EPA regulations are "based on outdated science." (Harrison Decl. ¶¶ 5–16.) Moreover, Plaintiffs have not introduced evidence that Measure E would harm the environment in Kern County such that there is reason to suspect the stated purpose is merely pretextual. Thus, at this stage, Plaintiffs have not demonstrated a likelihood of success or even a serious question on the merits of their equal protection claim.

### b. Dormant Commerce Clause

#### i. Overview of the Dormant Commerce Clause

Review is more stringent under the Commerce Clause analysis, however. In addition to affirmatively granting power to Congress, the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, limits the power of states and local government to adopt ordinances that interfere with interstate commerce, even "[w]hen legislating in areas of legitimate local concern, such as environmental protection and resource conservation." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

■ The Supreme Court has articulated two independent measures for potential Commerce Clause violations. First, "laws that discriminate against interstate commerce face 'a virtually per se rule of invalidity.'" *Granholm v. Heald,* 544 U.S. 460, 476, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (quoting *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)). " '[D]iscrimination' simply

means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Or. Dep't of Envtl. Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). Such laws survive only if the government can demonstrate both that the law serves a legitimate local purpose and that this purpose could not be served as well by available nondiscriminatory means. *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986).

■ Second, under the so-called *"Pike* Test," "nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " *Or. Waste Sys.,* 511 U.S. at 99, 114 S.Ct. 1345 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

■■ However, "[w]here state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Mass. Council of Constr. Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (quoting *S. Pac. Co. v. Arizona,* 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)). Courts should not assume Congress has authorized a discriminatory local regulation, however, unless it clearly expresses an intent to do so. *Hillside Dairy Inc. v. Lyons,* 539 U.S. 59, 66, 123 S.Ct. 2142, 156 L.Ed.2d 54 (2003).

#### ii. Plaintiffs Are Likely to Demonstrate a Commerce Clause Violation

##### (a). Biosolids Are an Article in Interstate Commerce

The threshold question whether Measure E is subject to the Commerce Clause analysis is easily answered in the affirma-

tive. A local government's regulation of waste and waste disposal services constitutes "regulation of interstate commerce" where the regulation's economic effects are interstate in reach. *E.g., C & A Carbone, Inc. v. Town of Clarkstown, N.Y.,* 511 U.S. 383, 389, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). Here, the record reflects that disposal sites for biosolids are relatively scarce such that elimination of sites drives up the costs of disposal at other locations (Stahl Decl. ¶ 24), and that elimination of the sites in Kern County will likely lead to diversion of the material to Arizona (Hogan Decl. Exs. 6–8; Stahl Decl. ¶ 17; Ghirelli Decl. ¶ 8). This suffices to bring Measure E within the ambit of the Commerce Clause. *See, e.g., C & A Carbone,* 511 U.S. at 389, 114 S.Ct. 1677.

*(b). Congress Has Not Authorized Discrimination*

Approval for local regulation in general does not constitute express approval for discriminatory regulation. *See South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91–92, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984); *Sporhase v. Nebraska, ex rel. Douglas,* 458 U.S. 941, 960, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982). Here, although 33 U.S.C. § 1345(e) allows localities to regulate land application of biosolids, it does not express any intent—much less a clear intent—to allow such regulations to discriminate against interstate commerce. Accordingly, the Court must examine whether Measure E discriminates against interstate commerce, or whether its incidental burdens on interstate commerce are clearly excessive in relation to its putative local benefits.

*(c). Plaintiffs Will Likely Show that Measure E's Intent and Effect Are To Discriminate Impermissibly Against Interstate Commerce*

The parties agree that Measure E does not facially discriminate against interstate commerce. That is, to know when the ban on land application of biosolids applies, enforcing authorities need not determine the geographic origin of the biosolids. Rather, Measure E prohibits land application regardless of the origin. (Compl. Ex. A [Measure E] §§ 8.04.040(A), 8.05.050(A), 8.05.060.)

■ However, the lack of facial discrimination does not end the inquiry. The Commerce Clause "forbids discrimination, whether forthright or ingenious. In each case, [courts must] determine whether the statute under attack ... will *in its practical operation* work discrimination against interstate commerce." *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 201, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (quoting *Best & Co. v. Maxwell,* 311 U.S. 454, 455–56, 61 S.Ct. 334, 85 L.Ed. 275 (1940)) (emphasis added). Moreover, a court may find that a law constitutes "economic protectionism" on proof either of discriminatory purpose or of discriminatory effect. *E.g., Clover Leaf Creamery,* 449 U.S. at 471 n. 15, 101 S.Ct. 715.

■ Here, Plaintiffs have demonstrated evidence of both a discriminatory purpose and a discriminatory effect. As to purpose, there is little question that Measure E was enacted in part to benefit in-county economic interests: among Measure E's stated purposes is a desire to prevent "loss of confidence in agricultural products from Kern County" that could result from land application of biosolids. (Compl. Ex A [Measure E] § 8.04.01.) The phrase "loss of confidence" indicates that, in addition to environmental concerns, part of Measure E's intent was to avoid purely economic harms that could result from a negative perception of Kern County agricultural products resulting from the land application of biosolids.

Additionally, Plaintiffs have introduced evidence that Measure E was intended specifically to burden out-of-county eco-

nomic interests. Because Measure E was enacted as a ballot measure, the Court may look to the nature of the initiative campaign to determine the intent of the drafters and voters in enacting it. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). And the campaign is particularly telling here: it included entreaties to "Keep L.A. Sludge out of Kern County" and "It's time we tell L.A. that we've had enough." It also included images of stacked outhouses, with the one on top labeled "L.A. County" and the one on the bottom labeled "Kern County" (with obvious implications). Plaintiffs have thus offered evidence that Measure E was enacted in part because of—rather than despite—its impacts on articles of commerce flowing from Los Angeles and Los Angeles County. This constitutes evidence of a discriminatory intent. *See Clover Leaf Creamery*, 449 U.S. at 471, 101 S.Ct. 715.

As for discriminatory effect, Kern is correct that the geographic limitation of Measure E to "unincorporated" areas does not itself constitute discrimination because the incorporated areas of Kern County are necessarily outside Kern's jurisdiction. *County Sanitation*, 127 Cal.App.4th at 1612, 27 Cal.Rptr.3d 28 (citing Cal. Const. art. XI, § 7; *City of Dublin v. County of Alameda*, 14 Cal.App.4th 264, 274–75, 17 Cal.Rptr.2d 845 (Ct.App.1993)). However, the record indicates that the only two sites in Kern's jurisdiction where land application occurs are Plaintiffs' Green Acres and Tule Ranch sites (Stockton Decl. ¶ 20), and

there is no evidence that an in-county producer of sewage sludge currently applies its biosolids to land in the unincorporated areas.[1] Cities within Kern County dispose of their biosolids elsewhere (including in the incorporated areas of the County), and waste generated by Kern itself is shipped to a private contractor that sells it for composting. (McCutcheon Decl., Ex. A [Memo Re: Impact of Measure E].)[2] This means that the only biosolid producers that must cease operations in Kern's jurisdiction—and that would thus be forced to incur the costs of procuring alternate means of disposal in an increasingly competitive marketplace—are those outside the County.

In sum, the record includes evidence indicating a desire to keep "L.A. sludge" out of Kern County in order to protect the reputation of Kern's agricultural industry, and a resulting ordinance that affects only biosolids from out-of-county entities. Plaintiffs have thus introduced evidence that Measure E discriminates against interstate commerce.

As such, the burden shifts to Kern to demonstrate that Measure E furthers a legitimate non-economic purpose in the least discriminatory way possible. *Maine*, 477 U.S. at 138, 106 S.Ct. 2440. Kern advances no such argument here, and it appears unlikely it could meet such a high bar. While Measure E states that the environmental effects of biosolid application cannot feasibly be mitigated (Compl. Ex. A [Measure E] § 8.05.10), at this stage

---

**1.** This distinguishes the present case from *County Sanitation*, where the record indicated that the City of Shafter "applied biosolids from its treatment plant to neighboring agricultural land that was in the unincorporated area of Kern County." 127 Cal.App.4th at 1613, 27 Cal.Rptr.3d 28.

**2.** The Court recognizes that Measure E would prevent compost sold by Kern's private contractor—San Joaquin Composting—from be-

ing spread on Kern's farmland unless it were packaged for retail sales for "residential use in limited quantities." (*See* Compl. Ex. A [Measure E] § 8.05.030(B).) Kern does not contend, however, that Measure E will impact San Joaquin Composting's business to the extent of rendering it a less practical outlet for Kern's biosolids. On this record, then, only out-of-county government entities are adversely impacted by Measure E.

the record does not reflect such infeasibility. If the concern is groundwater impact, Kern could merely have banned land application on sites where it might impact on groundwater supplies. And if the concern is that crops grown with biosolids could harm humans when consumed by livestock that enters the food chain, then a ban on the sale of such crops for such purpose would suffice. In short, on this record, alternatives appear to exist.

Accordingly, the Court concludes that Plaintiffs have demonstrated a likelihood of success on their claim that Measure E violates the Commerce Clause.

### c. State Law Preemption

█ Plaintiffs also have a likelihood of success on their claim for preemption by the CIWMA, because Measure E appears to thwart the statute's express purpose of promoting recycling of wastes such as biosolids before other methods of disposal. When enacted in 1989, the CIWMA required local governments to adopt waste management plans to divert 25% of the solid waste produced in their jurisdictions from landfills by 1995 and 50% by 2000. Cal. Pub. Res.Code § 41780. Additionally, the CIWMA provides:

> In implementing this division, the board and local agencies *shall* do both of the following:
>
> (a) Promote the following waste management practices *in order of priority:*
>
> (1) Source reduction.
>
> (2) *Recycling* and composting.
>
> (3) Environmentally safe transformation and environmentally safe land disposal, at the discretion of the city or county.
>
> (b) Maximize the use of all feasible source reduction, recycling, and composting options in order to reduce the amount of *solid waste* that must be disposed of by transformation and land disposal. For wastes that cannot feasibly

be reduced at their source, recycled, or composted, the local agency may use environmentally safe transformation or environmentally safe land disposal, or both of those practices.

Cal. Pub. Res.Code § 40051 (emphases added). The CIWMA defines "solid waste" to include sewage sludge, *id.* § 40191, and "recycling" to include "cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace," *id.* § 40180.

The CIWMA thus uses mandatory language to require that local agencies recycle wastes—including biosolids—that cannot be eliminated through source reduction. And it does so specifically to further the goal of avoiding placing such waste in landfills. *Valley Vista Servs., Inc. v. City of Monterey Park,* 118 Cal. App.4th 881, 886, 13 Cal.Rptr.3d 433 (Ct. App.2004) (citing *City of Alhambra v. P.J.B. Disposal Co.,* 61 Cal.App.4th 136, 138, 71 Cal.Rptr.2d 364 (Ct.App.1998)); *see also Waste Mgmt. of the Desert, Inc. v. Palm Springs Recycling Ctr., Inc.,* 7 Cal.4th 478, 494, 28 Cal.Rptr.2d 461, 869 P.2d 440 (1994); *County Sanitation Dist. No. 2 of Los Angeles County v. County of Kern,* 127 Cal.App.4th 1544, 1567, 27 Cal.Rptr.3d 28 (Ct.App.2005) ("This legislation caused sewage sludge to be diverted from disposal in landfills In favor of recycling it as a fertilizer applied to agricultural land.").

█ In light of this mandatory language, CIWMA's savings clause offers Kern little comfort. Although the act allows local regulations that do not conflict with state policies, Cal. Pub. Res.Code § 40053, the California Supreme Court has indicated that "when a statute or statutory

scheme seeks to promote a certain activity and, at the same time, permits more stringent local regulation of that activity, local regulation cannot be used to completely ban the activity or otherwise frustrate the statute's purpose." *Great W. Shows. Inc. v. County of Los Angeles,* 27 Cal.4th 853, 868, 118 Cal.Rptr.2d 746, 44 P.3d 120 (2002) (citing *Blue Circle Cement, Inc. v. Board of County Commissioners of County of Rogers,* 27 F.3d 1499, 1506–07 (10th Cir.1994)); *cf. Int'l Bhd. of Elec. Workers v. City of Gridley,* 34 Cal.3d 191, 193, 193 Cal.Rptr. 518, 666 P.2d 960 (1983) ("Although the Legislature did not intend to preempt all aspects of labor relations in the public sector, we cannot attribute to it an intention to permit local entities to adopt regulations which would frustrate [its] declared policies and purposes . . . ."); *Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 869, 120 S.Ct. 1913, 146 L.Ed.2d 914 (holding that a "saving clause . . . does not bar the ordinary working of conflict pre-emption principles").

■ Similarly unavailing is Kern's claim that the Water Code—not the CIWMA—is the exclusive source for the regulation of the land application of biosolids, and thus that the express statutory objectives laid out in the CIWMA have no application to the question before this Court. This argument lacks merit because Water Code section 13274 merely outlines the various spheres of authority for state *regulatory agencies;* it does not supercede

previously enacted ***legislation*** impacting biosolids. *See* Cal. Wat.Code § 13274(d) ("except as specified . . . general waste discharge requirements ***prescribed by a regional board*** pursuant to this section supersede regulations adopted by any other state agency to regulate sewage sludge and other biological solids" (emphasis added)). Thus, while it is true that section 13274 allows the State Water Resources Control Board to issue regulations that would supercede those promulgated by the Integrated Waste Management Board ("IWMB"), this allocation of regulatory authority in no way replaces, undermines or supercedes the legislature's stated objective of promoting the recycling of biosolids over other methods of disposal, such as burning or placing them in landfills. Cal. Pub. Res.Code § 40051. In fact, the legislative intent of section 13274 was merely to "streamline regulatory procedure for a low-risk activity that recycles valuable organics back to agricultural lands, as well as provide consistency within the regulatory arena for similar projects and eliminate the need for other state agencies to independently regulate the activity." Letter from David Kelley, California Senator, to Bill Lockyer, California Senate President pro Tempore (Jan. 5, 1996) in Senate Daily Journal 3093 (1995–1996). Thus, since the Court is not faced with a conflict between competing state agencies—but rather between the legislative policy of the state and a local ordinance—the "division of authority" in section 13274 is irrelevant.[3]

---

3. For similar reasons, Kem's citations to various administrative interpretations are also unhelpful. First, the State Water Board's General Order 2004–0012 merely states that the Water Code does not preempt local agencies' authority to prohibit land application of biosolids. (Hogan Decl., Ex. 3 [General Order] ¶ 20.) While the Court agrees that the ***Water Code*** does not preempt a local ban (see 10/24/06 Order at 24–25), the General Order carries little weight here because it does not purport to interpret the ***CIWMA.*** (*Id.* ¶ 1

("This General Order is intended to satisfy the requirements of CWC section 13274 . . . .")); *see also* County Sanitation, 127 Cal.App.4th at 1606 n. 69, 27 Cal.Rptr.3d 28 ("General Order 2004–0012 . . . states the ***Water Code*** does not preempt the authority of local agencies to prohibit the use of biosolids . . . ." (emphasis added)). Second, the IWMB's resolution 98–255 merely confirms that the IWMB does not have jurisdiction over land application of biosolids. Again, this does not negate CIWMA's

As a result, it is simply inaccurate to say that the CIWMA does not address land application of biosolids. By mandating that local agencies ensure "recycling" occurs before other disposal methods, the CIWMA's scope is broad enough to include land application.

Accordingly, Measure E's ban on land application of biosolids is likely to thwart the express goals of the CIWMA and thus fail outside the CIWMA savings clause. This is especially true given undisputed evidence that Measure E will require an increase in landfilling of biosolids. (Stahl Decl. ¶ 15.) As a result, Plaintiffs demonstrate a likelihood of success on their claim that Measure E is preempted by state statute.

### d. Invalid Exercise of Police Power

#### i. *Overview of the Police Power*

 In California, a local government's exercise of the police power is valid if "the restriction in fact bears a reasonable relation to the general welfare." *Associated Home Builders of the Greater E. Bay. Inc. v. City of Livermore*, 18 Cal.3d 582, 601, 135 Cal.Rptr. 41, 557 P.2d 473 (1976) (*"Associated Home Builders"*). "But municipalities are not isolated islands remote from the needs and problems of the area in which they are located; thus an ordinance, superficially reasonable from the limited viewpoint of the municipality, may be disclosed as unreasonable when viewed from a larger perspective." *Id.* at 607, 135 Cal.Rptr. 41, 557 P.2d 473. As a result, "[t]he 'general welfare' that must be considered may extend beyond the geographical limits of the local governmental entity adopting the ordinance." *County Sanitation*, 127 Cal.App.4th at 1615, 27 Cal.Rptr.3d 28. "[I]f a restriction significantly affects residents of surrounding communities, the constitutionality of the

mandates that local agencies promote recy-

restriction must be measured by its impact not only upon the welfare of the enacting community, but upon the welfare of the surrounding region." *Associated Home Builders*, 18 Cal.3d at 601, 135 Cal.Rptr. 41, 557 P.2d 473.

In evaluating ordinances with effects on surrounding communities, the court must identify and weigh the competing interests affected by the ordinance and ask "whether the ordinance, in light of its probable impact, represents a reasonable accommodation" of those competing interests. *Id.* at 609, 135 Cal.Rptr. 41, 557 P.2d 473. Although deference is owed to the judgment of the local entity,

> [j]udicial deference is not judicial abdication. The ordinance must have a real and substantial relation to the public welfare. There must be a reasonable basis in fact, not in fancy, to support the legislative determination ... [a]lthough in many cases it will be 'fairly debatable' that the ordinance reasonably relates to the regional welfare ....

*Id.*

#### ii. *Plaintiffs Are Likely To Demonstrate That Measure E Constitutes an Invalid Exercise of Police Power*

██ The competing Interests here can be summarized as follows. Kern seeks to protect its agricultural lands, products, and the public health of its citizens from potential—but as yet unascertained—harm from biosolids disposal. On the other hand, the government Plaintiffs seek to dispose of their biosolids in an environmentally-friendly, financially feasible manner. Upon close inspection of the record here, Measure E cannot reasonably be said to accommodate these competing interests.

cling before other methods of disposal.

It is important to note that biosolids will be generated regardless of whether Measure E is enforced, and any biosolids generated must be managed in one way or another. This means that absent some special reason why the Green Acres and Tule Ranch sites are ill-suited for land application, Measure E would merely shift any adverse effects to other areas, where they would be magnified by the need to haul the sludge over increased distances. In fact, the City of Los Angeles has introduced evidence that indicates Green Acres is an ideal site and that a shift to the next most cost-effective land application sites—in Arizona—would result in a threefold increase in emissions of particulate matter and oxides of nitrogen, both of which have been identified as toxic air contaminants and are known to cause adverse health effects. (Minamide Decl. ¶¶ 9, 46; *id.* Ex. 2 [Emissions Assessment] at i, ii, 17.) Even worse some amount of the material will be diverted to landfills (Stahl Decl. ¶ 15), which is precisely what the CIWMA seeks to prevent.

The Court is not unsympathetic to Kern's feeling of being "dumped on" by larger counties. However, such feelings do not constitute palpable interests for purposes of the regional welfare analysis when they are unaccompanied by evidence of actual environmental harm, and Kern has offered no such evidence. Kern's only "evidence" of deterioration at Green Acres is a *draft* 2005 environmental impact report ("EIR") prepared by the City of Los Angeles, which states, "Monitoring the quality of groundwater beneath Green Acres between 1993 and 2000 indicated degradation from surface activities." (Hogan Decl., Ex. 11 [Draft EIR] at 3.11–26.) However, before the final version of the EIR was adopted by the Los Angeles Board of Public Works on October 4, 2006, the City adopted an Addendum to the EIR which indicated that the draft version erroneously omitted the word "no" before the word "degradation." (Minamide Reply Decl. ¶¶ 14–15.) Thus, the sentence was corrected to read: "Monitoring the quality of groundwater beneath Green Acres Farm between 1993 and 2000 indicated *no* degradation from surface activities." (*Id.,* Ex. A [Errata Sheet] (emphasis added).) The so-called "evidence" is also contradicted by evidence that groundwater monitoring at Green Acres indicates no significant impacts from biosolids. (Johnson Decl. ¶¶ 35–39.) Accordingly, the only evidence of environmental harm at Green Acres is no evidence at all, which is telling in light of the extensive data the City has provided Kern regarding Green Acres. (*See* Minimide Decl. ¶ 25; *id.* Ex. 1 [Monthly Progress Report].) Moreover, Kern does not offer any evidence of harms caused by biosolid application at Tule Ranch, nor does it contend that such harms have occurred.

Kern's main support for Measure E is expert testimony from Ellen Harrison, Director of the Cornell University Waste Management Institute, to the effect that the environmental impacts of biosolids are unknown, and that the EPA regulations governing them are based on outdated science. (*E.g.,* Harrison Decl. ¶¶ 7, 9, 12.) But while scientific uncertainty constitutes a rational basis for making a distinction between biosolids and other fertilizers, the Court cannot conclude that it reasonably tips the regional interest in favor of Measure E, particularly where there is "no documented scientific evidence that the Part 503 rule has failed to protect public health" (*id.* ¶ 5), and particularly where there is no suggestion that Green Acres or Tule Ranch have adversely impacted the environment. In fact, undisputed evidence shows that the biosolids operations at Green Acres is in compliance with all applicable regulations and presents no discernable threat to public health. (*E.g.,* Page Decl. ¶¶ 14, 16–18; Pepper Decl.

¶¶ 9, 14; Gerba Decl. ¶¶ 2, 7, 10). One expert, Professor Charles Gerba, goes so far as to describe Green Acres as "one of the best monitored and professionally operated land application sites" he has studied. (Gerba Decl. ¶ 10.) Closing such a site without benefit to the region cannot be said to accommodate the regional interest.

Plaintiffs are thus likely to demonstrate that Measure E constitutes an invalid exercise of the police power.

### 2. THE BALANCE OF HARDSHIPS TIPS SHARPLY IN PLAINTIFFS' FAVOR

#### a. Plaintiffs Demonstrate Irreparable Harm

#### i. *The Government Plaintiffs*

 Cities and municipalities may not seek damages pursuant to 42 U.S.C. § 1983, *Rockford Bd. of Educ., Sch. Dist. No. 205 v. Ill. State Bd. of Educ.*, 150 F.3d 686 (7th Cir.1998); *City of Safety Harbor v. Birchfield*, 529 F.2d 1251 (5th Cir.1976). This means that the costs of Measure E to the government Plaintiffs are without adequate legal remedy: the government Plaintiffs have no vehicle to compensate economically for the harms that would result from Measure E. And the harm is significant. Specifically, the City of Los Angeles will incur more than $4 million annually in additional costs to relocate its biosolids program. It will also lose some value of its more than $25 million investment in acquiring land in Kern County and in upgrading sewage treatment facilities to comply with Kern's previous regulations of biosolids. (Minamide Decl. ¶¶ 7–8, 23, 31–

37.)[4] LACSD will be required to increase the amount of biosolids disposed within its scare landfill capacity, and will also incur costs in relocating its disposal programs to more distant sites. (Stahl Decl. ¶¶ 15, 17.) OCSD will incur similar costs. (Ghirelli Decl. ¶¶ 6–8.) Moreover, while the effects of Measure E will likely be mitigated by the government Plaintiffs' ability to divert their biosolids to facilities in Arizona (Hogan Decl. Exs. 6–8; Stahl Decl. ¶ 17; Ghirelli Decl. ¶ 8), the lack of a catastrophic harm in no way precludes preliminary injunctive relief here, particularly because of the strong showing of probable success on the merits.

Moreover, this diversion effect is precisely what constitutes irreparable harm to the members of Plaintiff California Association of Sanitation Agencies ("CASA"). The Tule Ranch and Green Acres sites together total over 8,000 acres and provide biosolids management for approximately one-third of California's biosolids. (Stahl Decl. ¶ 24.) As a result, their closure would force the many tons of biosolids recycled there into the market for other management options, thereby increasing costs for CASA's member agencies. (*Id.*)

#### ii. *The Private Plaintiffs*

While the private Plaintiffs have standing to seek damages, those damages will nonetheless constitute an inadequate remedy because of the possibility of fatal business losses and the difficulty of measuring damages even if the businesses survive. *See, e.g., Gilder v. PGA Tour, Inc.*, 936

---

4. Kern contends that the hardship extension granted to the City of Los Angeles and RBM means that those Plaintiffs cannot demonstrate the requisite "immediate" threat of harm because they will not be subject to the ban until April 21, 2007. This argument lacks merit. Given the certainty that the ban would apply at that date, as well as the likelihood that litigation in this matter will not be con-

cluded before then, there is nothing speculative or hypothetical—or even particularly remote—about the harms Plaintiffs will suffer. *See* William W. Schwarzer, et al., *California Practice Guide: Federal Civil Procedure Before Trial* § 13:55.3 ("[W]here a timely trial is not possible, the fact the threatened harm will not occur for several months is not reason, by itself, to deny a preliminary injunction.").

F.2d 417, 423 (9th Cir.1991) ("where the threat of injury is imminent and the measure of that injury defies calculation, damages will not provide a remedy at law"); *Church of Scientology of Cal. v. United States,* 920 F.2d 1481, 1489 (9th Cir.1990) (quoting *Church of Scientology Celebrity Centre v. Egger,* 539 F.Supp. 491, 497 (D.D.C.1982)) (likelihood of financial ruin constitutes irreparable injury); 11A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2948.1, at 159–60 (2d ed. 1995 & Supp.2006) ("when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted").

*(a). Green Acres Plaintiffs*

Plaintiff RBM's contract with the City of Los Angeles to manage land application at the Green Acres site comprises RBM's entire business, and thus Measure E risks forcing RBM out of business entirely. (Stockton Decl. ¶¶ 23–24.) And even if RBM remains in business, such as by attempting to service Los Angeles' diversion of disposal actions to Arizona, it would incur costs in the form of increased business risks. For example, the round-trip driving distance to the City's Arizona sites would be nearly three times the distance from Los Angeles to Green Acres, which would result in increased fuel costs and risk of traffic accidents. (*Id.* ¶ 27.) A relocation of RBM's business to Arizona would also demand significant new investments in infrastructure and the uncertainty of relocating its human resources, which are currently based in Santa Barbara and Lompoc. (*Id.* ¶¶ 28–29, 33.) The risk of total business failure and the difficulty of quantifying losses if the business survives means RBM has demonstrated a risk of irreparable harm.

Sierra Transport faces similar risks. Its hauling work for RBM and the City of Los Angeles comprise 83% of its entire business, which means Measure E presents the risk of total business failure. (Lutrel Decl. ¶¶ 7, 9.) Relocation to Arizona would also mean uncertainty and increased costs that would be difficult to quantify, as well as a loss of current infrastructure investments near Green Acres. (*Id.* ¶¶ 9–15.)

With respect to R & G Fanucchi, the showing of harm is less clear, but nonetheless adequate. R & G Fanucchi's farming contract with the City of Los Angeles generates approximately $2 million each year (Fanucchi Decl. ¶ 3), but the record does not indicate what percentage of its business this figure represents. Also unclear is why the fact that a ban on biosolids would render Green Acres unfarmable would constitute irreparable harm to Fanucchi, which merely contracts to farm the land there. (*Id.* ¶ 11.) Moreover, the company apparently owns and operates other farms, thus it appears more likely to weather the impact of Measure E than RBM or Sierra Transport. (*See id.* ¶ 10.) Thus, the only showing that harm would be irreparable is some difficulty in measuring damages to R & G Fanucchi's operational investments and the lost revenues in crop sales attributable to a biosolids ban. (*See id.* ¶¶ 10–11.)

At the same time, R & G Fannuchi's relatively weak showing of irreparable harm is mitigated by its strong likelihood of success on the merits, as well as by the fact that including it in the injunction is necessary to provide relief to the City of Los Angeles, RBM, and Sierra Transport. *Cf. Price v. City of Stockton,* 390 F.3d 1105, 1117 (9th Cir.2004) (an injunction benefitting nonparties is permissible if such breadth is necessary to give prevailing parties the relief to which they individually are entitled); *Bresgal v. Brock,* 843 F.2d 1163, 1170–71 (9th Cir.1987) ("an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in

the lawsuit if such breadth is necessary to give prevailing parties the relief to which they are entitled"). The Court thus concludes R & G Fanucchi has met its burden.

### (b). *Tule Ranch Plaintiffs*

The operations at Tule Ranch are more integrated than at Green Acres, thus compounding the harm suffered there. Plaintiff Shaen Magan owns and operates the Tule Ranch site, which depends on biosolids to remain viable for farming. (Magan Decl. ¶ 6.) Magan also testifies that the fees generated by biosolids are essential to his remaining in business. (Magan Decl. ¶ 12.) Additionally, Western Express generates 90% of its business by hauling biosolids to Tule Ranch and would also face the possibility of business failure if forced to move its operations to Arizona. (*Id.* ¶¶ 8–9.) And while Magan's Arizona businesses might enable him to weather Measure E, this would in no way impact the analysis for Kern-based Western Express. (*Id.* ¶ 8.) Additionally, as with R & G Fanucchi, the difficulty in quantifying losses to Magan and Western Express that would be caused by a shift to Arizona, combined with the central role they play in OCSD's and LACSD's use of biosolids persuade the Court that the requisite irreparable harm has been shown.

Accordingly, the Court concludes each Plaintiff has met its burden to demonstrate the requisite degree of irreparable harm, particularly in light of the strong likelihood of success on the merits and the need for the private Plaintiffs' services to continue in order for the government Plaintiffs to avoid irreparable harm.

### b. **The Harm to Kern is Outweighed By the Harm to Plaintiffs**

As was made clear above, the harm to Kern from biosolids application is merely potential, and not yet supported by substantial evidence. Continued application of Class A EQ biosolids during the pendency of this litigation pales in comparison to the harm Plaintiffs would suffered as a result of Measure E.

### 3. THE PUBLIC INTERESTS FAVORS THE RELIEF SOUGHT

From the foregoing discussion, it is clear that preliminary injunctive relief is in the public interest. The public is best served by disposing of sewage sludge in the safest and least expensive manner possible. On this record, that method is land application of Class A EQ biosolids at Tule Ranch and Green Acres.

### IV.

### CONCLUSION

The Court thus concludes that Plaintiffs have demonstrated they are entitled to preliminary injunctive relief, and thus their motions are **GRANTED**. Pending trial in this matter, Defendants Kern County and Kern County Board of Supervisors are **ENJOINED** from directly or indirectly enforcing the ordinance known as "Measure E (Kern County Code §§ 8.05.010–8.05.060) at the Green Acres and Tule Ranch sites against Plaintiffs City of Los Angeles, Los Angeles County Sanitation District No. 2, Orange County Sanitation District, Responsible Biosolids Management, Inc., Sierra Trucking, Inc., R & G Fanucchi Farms, Inc., Shaen Magan, Western Express Inc., and their agents, employees, contractors, or any other persons in active concert or participation with those persons listed above at the locations listed above." In the meantime, Plaintiffs are **ORDERED** to comply with the terms of the biosolids ordinance as it existed immediately prior to adoption of Measure E.

IT IS SO ORDERED.