# HILLSIDE DAIRY INC. ET AL. v. LYONS, SECRETARY, CALIFORNIA DEPARTMENT OF FOOD AND AGRICULTURE, ET AL.

No. 01–950.  Argued April 22, 2003—Decided June 9, 2003*

*Together with No. 01–1018, *Ponderosa Dairy et al.* v. *Lyons, Secretary, California Department of Food and Agriculture, et al.*, also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, Parts I and III of which were unanimous, and Part II of which was joined by REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ. THOMAS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 68.

*Roy T. Englert, Jr.,* argued the cause for petitioners in both cases. With him on the briefs were *Lawrence S. Robbins, Charles M. English, Jr., Wendy M. Yoviene,* and *Nicholas C. Geale.*

*Barbara McDowell* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Olson, Assistant Attorney General*

*McCallum, Deputy Solicitor General Kneedler,* and *Mark B. Stern.*

*Mark J. Urban* argued the cause for respondents in both cases. With him on the brief were *Bill Lockyer,* Attorney General of California, *Manuel M. Medeiros,* State Solicitor General, *Richard M. Frank,* Chief Assistant Attorney General, *Bruce F. Reeves* and *Mark J. Urban,* Deputy Attorneys General, and *Andrea Hackett Henningsen.*†

JUSTICE STEVENS delivered the opinion of the Court.

In most of the United States, not including California, the minimum price paid to dairy farmers producing raw milk is regulated pursuant to federal marketing orders. Those orders guarantee a uniform price for the producers, but through pooling mechanisms require the processors of different classes of dairy products to pay different prices. Thus, for example, processors of fluid milk pay a premium price, part of which goes into an equalization pool that provides a partial subsidy for cheese manufacturers who pay a net price that is lower than the farmers receive. See *West Lynn Creamery, Inc.* v. *Healy,* 512 U. S. 186, 189, n. 1 (1994).

The California Legislature has adopted a similar program to regulate the minimum prices paid by California processors to California producers. In the cases before us today, out-of-state producers are challenging the constitutionality of a 1997 amendment to that program. They present us with two questions: (1) whether § 144 of the Federal Agriculture

---

†Briefs of *amici curiae* urging reversal were filed for the State of Nevada et al. by *Brian Sandoval,* Attorney General of Nevada, and by the Attorneys General for their respective States as follows: *Mike Hatch* of Minnesota, *Mike McGrath* of Montana, *Hardy Myers* of Oregon, *Christine O. Gregoire* of Washington, and *Peggy A. Lautenschlager* of Wisconsin; for Continental Dairy Products, Inc., et al. by *Benjamin F. Yale;* and for the Dairy Institute of California by *Thomas S. Knox.*

*John J. Vlahos* filed a brief for Western United Dairymen as *amicus curiae* urging affirmance.

Improvement and Reform Act of 1996, 110 Stat. 917, 7 U. S. C. § 7254, exempts California's milk pricing and pooling regulations from scrutiny under the Commerce Clause; and (2) whether the individual petitioners' claim under the Privileges and Immunities Clause is foreclosed because those regulations do not discriminate on their face on the basis of state citizenship or state residence.

## I

Government regulation of the marketing of raw milk has been continuous since the Great Depression.[1] In California, three related statutes establish the regulatory structure for milk produced, processed, or sold in California. First, in 1935, the State enacted the Milk Stabilization and Marketing Act, Cal. Food & Agric. Code Ann. §§ 61801–62403 (West 2001), "to establish minimum producer prices at fair and reasonable levels so as to generate reasonable producer incomes that will promote the intelligent and orderly marketing of market milk . . . ." § 61802(h). Then, California created requirements for composition of milk products in the Milk and Milk Products Act of 1947. §§ 32501–39912. The standards created under this Act mandate minimum percentages of fat and solids-not-fat in dairy products and often require fortification of milk by adding solids-not-fat. In 1967, California passed another milk pricing Act, the Gonsalves Milk Pooling Act, §§ 62700–62731, to address deficiencies in the existing pricing scheme. Together, these three Acts (including numerous subsequent revisions) create the state milk marketing structure: The 1935 and 1967 Acts establish the milk pricing and pooling plans, while the 1947 Act governs the composition of milk products sold in California.

While it serves the same purposes as the federal marketing orders, California's regulatory program is more complex.

---

[1] The history and purpose of federal regulation of milk marketing is described in some detail in *Zuber* v. *Allen*, 396 U. S. 168, 172–187 (1969).

Federal orders typically guarantee all producers the same minimum price and create only two or three classes of end uses to determine the processors' contributions to, or withdrawals from, the equalization pools, whereas under the California scheme some of the farmers' production commands a "quota price" and some receives a lower "overbase price," and the processors' end uses of the milk are divided into five different classes.

The complexities of the California scheme are not relevant to these cases; what is relevant is the fact California processors of fluid milk pay a premium price (part of which goes into a pool) that is higher than either of the prices paid to the producers.[2] During the early 1990's, market conditions made it profitable for some California processors to buy raw milk from out-of-state producers at prices that were higher than either the quota prices or the overbase prices guaranteed to California farmers yet lower than the premium prices they had to pay when making in-state purchases. The regulatory scheme was at least partially responsible for the advantage enjoyed by out-of-state producers because it did not require the processors to make any contribution to the equalization pool on such purchases. In other words, whereas an in-state purchase of raw milk resold as fluid milk required the processor both to pay a guaranteed minimum to the farmer and also to make a contribution to the pool, an out-of-state purchase at a higher price would often be cheaper because it required no pool contribution.

In 1997, the California Department of Food and Agriculture amended its plan to require that contributions to the

---

[2] Because processors of fluid milk typically manufacture some other products as well, their respective pool contributions reflect the relative amounts of those end uses. Each processor's mix of end uses produces an individual monthly "blend price" that is multiplied by its total purchases. Under federal orders the term "blend price" has a different meaning; it usually refers to the price that the producer receives. See *West Lynn Creamery, Inc.* v. *Healy,* 512 U. S. 186, 189, n. 1 (1994).

pool be made on some out-of-state purchases.[3]   It is the imposition of that requirement that gave rise to this litigation. Petitioners in No. 01–950 operate dairy farms in Nevada; petitioners in No. 01–1018 operate such farms in Arizona. They contend that the 1997 amendment discriminates against them.   In response, the California officials contend that it merely eliminated an unfair competitive advantage for out-of-state producers that was the product of the regulatory scheme itself.

Without reaching the merits of petitioners' constitutional claims, the District Court dismissed both cases and the Court of Appeals for the Ninth Circuit affirmed.   259 F. 3d 1148 (2001).   Relying on its earlier decision in *Shamrock Farms Co.* v. *Veneman,* 146 F. 3d 1177 (1998), the court held that a federal statute enacted in 1996 had immunized California's milk pricing and pooling laws from Commerce Clause challenge.   It also held that the corporate petitioners had no standing to raise a claim under the Privileges and Immunities Clause, and that the individuals' claim under that Clause failed because the 1997 plan amendments did not, "on their face, create classifications based on any individual's residency or citizenship."   259 F. 3d, at 1156.   We granted certiorari to review those two holdings, 537 U. S. 1099 (2003), but in doing so we do not reach the merits of either constitutional claim.

## II

In some respects, the State's composition standards set forth in the 1947 Act exceed those set by the federal Food and Drug Administration (FDA).   For example, California's minimum standard for reduced fat milk requires that it contain at least 10 percent solids-not-fat (which include protein,

---

[3] After the 1997 amendment, processors whose blend price exceeds the quota price must make contributions to the pool on their out-of-state purchases as well as their in-state purchases.

calcium, lactose, and other nutrients). Cal. Food & Agric. Code Ann. § 38211 (West 2001). Federal standards require that reduced fat milk contain only 8.25 percent solids-not-fat. See 21 CFR §§ 131.110, 101.62 (2002). Some of California's standards were arguably pre-empted by Congress' enactment of the Nutrition Labeling and Education Act of 1990, 104 Stat. 2353, which contains a prohibition against the application of state quality standards to foods moving in interstate commerce. See 21 U. S. C. § 343–1(a). The District Court so held in *Shamrock Farms Co.* v. *Veneman,* No. Civ–S–95–318 (ED Cal., Sept. 25, 1996). In response to that decision, California sought an exemption from both the FDA and Congress. See *Shamrock Farms,* 146 F. 3d, at 1180. Before the FDA acted, Congress responded favorably with the enactment of the statute that governs our disposition of these cases. That statute, § 144 of the Federal Agriculture Improvement and Reform Act of 1996, provides:

> "Nothing in this Act or any other provision of law shall be construed to preempt, prohibit, or otherwise limit the authority of the State of California, directly or indirectly, to establish or continue to effect any law, regulation, or requirement regarding—
>
> "(1) the percentage of milk solids or solids not fat in fluid milk products sold at retail or marketed in the State of California; or
>
> "(2) the labeling of such fluid milk products with regard to milk solids or solids not fat." 7 U. S. C. § 7254.

Thereafter, Shamrock Farms brought another suit against the Secretary of the California Department of Food and Agriculture challenging the validity of both the State's compositional standards and its milk pricing and pooling laws. In that case, the Court of Appeals held that § 144 had immunized California's marketing programs as well as the compositional standards from a negative Commerce Clause chal-

lenge. *Shamrock Farms,* 146 F. 3d, at 1182. In adhering to that ruling in the cases before us today, the Ninth Circuit erred.

The text of the federal statute plainly covers California laws regulating the composition and labeling of fluid milk products, but does not mention laws regulating pricing. Congress certainly has the power to authorize state regulations that burden or discriminate against interstate commerce, *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408 (1946), but we will not assume that it has done so unless such an intent is clearly expressed. *South-Central Timber Development, Inc.* v. *Wunnicke,* 467 U. S. 82, 91–92 (1984). While § 144 unambiguously expresses such an intent with respect to California's compositional and labeling laws, that expression does not encompass the pricing and pooling laws. This conclusion is buttressed by the separate California statutes addressing the composition and labeling of milk products, on the one hand, and the pricing and pooling of milk on the other. See *supra,* at 62–65 and this page. The mere fact that the composition and labeling laws relate to the sale of fluid milk is by no means sufficient to bring them within the scope of § 144. Because § 144 does not clearly express an intent to insulate California's pricing and pooling laws from a Commerce Clause challenge, the Court of Appeals erred in relying on § 144 to dismiss the challenge.

### III

Article IV, § 2, of the Constitution provides:

> "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

Petitioners, who include both individual dairy farmers and corporate dairies, have alleged that California's milk pricing laws violate that provision. The Court of Appeals held that the corporate petitioners have no standing to advance such

a claim, and it rejected the individual petitioners' claims because the California laws "do not, on their face, create classifications based on any individual's residency or citizenship." 259 F. 3d, at 1156. Petitioners do not challenge the first holding, but they contend that the second is inconsistent with our decision in *Chalker* v. *Birmingham & Northwestern R. Co.*, 249 U. S. 522 (1919). We agree.

In *Chalker*, we held that a Tennessee tax imposed on a citizen and resident of Alabama for engaging in the business of constructing a railroad in Tennessee violated the Privileges and Immunities Clause. The tax did not on its face draw any distinction based on citizenship or residence. It did, however, impose a higher rate on persons who had their principal offices out of State. Taking judicial notice of the fact that "the chief office of an individual is commonly in the State of which he is a citizen," we concluded that the practical effect of the provision was discriminatory. *Id.*, at 527. Whether *Chalker* should be interpreted as merely applying the Clause to classifications that are but proxies for differential treatment against out-of-state residents, or as prohibiting any classification with the practical effect of discriminating against such residents, is a matter we need not decide at this stage of these cases. Under either interpretation, we agree with petitioners that the absence of an express statement in the California laws and regulations identifying out-of-state citizenship as a basis for disparate treatment is not a sufficient basis for rejecting this claim. In so holding, however, we express no opinion on the merits of petitioners' Privileges and Immunities Clause claim.

\* \* \*

The judgment of the Court of Appeals is vacated, and these cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, concurring in part and dissenting in part.

I join Parts I and III of the Court's opinion and respectfully dissent from Part II, which holds that § 144 of the Federal Agriculture Improvement and Reform Act of 1996, 7 U. S. C. § 7254, "does not clearly express an intent to insulate California's pricing and pooling laws from a Commerce Clause challenge." *Ante,* at 66. Although I agree that the Court of Appeals erred in its statutory analysis, I nevertheless would affirm its judgment on this claim because "[t]he negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application," *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison,* 520 U. S. 564, 610 (1997) (THOMAS, J., dissenting), and, consequently, cannot serve as a basis for striking down a state statute.