**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 6, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PHILLIP M. KLEINSMITH,

       Plaintiff - Appellant,

v.

MARK L. SHURTLEFF, Attorney
General, State of Utah,

       Defendant - Appellee.

No. 07-4187

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:06-CV-387-BSJ)**

---

Submitted on the briefs:*

Philip M. Kleinsmith, pro se.

Nancy L. Kemp, Jerrold S. Jensen, Assistant Utah Attorneys General, Mark L.
Shurtleff, Utah Attorney General, Salt Lake City, Utah, for Defendant - Appellee.

---

Before **TACHA**, **EBEL**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

    *After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument.

Philip M. Kleinsmith resides in Colorado but is licensed to practice law in Utah. A specialist in nonjudicial foreclosures, he challenges the constitutionality of a Utah statute that requires all attorneys who act as trustees of real-property trust deeds in Utah to "maintain[] a place within the state" to meet with trustors for certain enumerated purposes related to foreclosures. Utah Code Ann. § 57-1-21(1)(a)(i) (2009). Mr. Kleinsmith, who has no Utah office, challenges the law on the grounds that the maintain-a-place requirement (1) is so vague that the statute violates the federal Constitution's Due Process Clause; (2) discriminates against and burdens nonresident attorneys, thereby injuring interstate commerce in violation of the Constitution's dormant Commerce Clause; (3) violates the Constitution's Article IV Privileges and Immunities Clause (and perhaps the Fourteenth Amendment's Privileges or Immunities Clause) by depriving nonresident attorneys of privileges enjoyed by residents of Utah; and (4) violates the Constitution's Equal Protection Clause by irrationally discriminating against nonresident attorney-trustees. He appeals from the ruling of the United States District Court for the District of Utah granting summary judgment to the defendant, Utah Attorney General Mark Shurtleff. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

I.     BACKGROUND

Trust-deed foreclosures are a significant part of Mr. Kleinsmith's law practice. A trust deed conveys real property in trust to secure a debt; the debtor,

-2-

who typically has used the loan proceeds to purchase a home, is also the trustor. *See id.* § 57-1-19.  In the event of default, the trustee may conduct a nonjudicial sale of the property or institute foreclosure proceedings.  *See id.* § 57-1-23.  According to Mr. Kleinsmith's complaint, as a trustee he could "prepare trustee foreclosure sale documents, supervise their recording, service, mailing and posting and supervise a crier to conduct foreclosure sales, all without . . . personally being present in the state of Utah."  Aplt. App. at 126.  Although Mr. Kleinsmith's only office is in Colorado Springs, Colorado, he has gained admission to practice law in 26 states, with the aim of building a national practice as a foreclosure trustee.  One state where he is admitted is Utah, whose bar he joined in 1989.  From 1998 to 2001 he earned more than $50,000 annually from Utah work relating to trust-deed foreclosures, but his income from this source "has declined to virtually nothing."  Reply Br. at 3.  He attributes the decline to amendments to the Utah statute governing the qualifications for trustees of trust deeds.

The initial amendment that harmed his business became effective in April 2001.  It required licensed Utah attorneys to reside in the state in order to qualify as trustees.  *See* 2001 Utah Laws ch. 236 § 2.  Mr. Kleinsmith successfully challenged the constitutionality of the residency requirement under the Privileges and Immunities Clause of Article IV of the Constitution.  *See Kleinsmith v.*

*Shurtleff*, No. 2:01cv0310 ST, slip op. at 15 (D. Utah Aug. 13, 2001) (Aplt. App. at 47).

The legislature then amended the statute effective May 6, 2002, to require that attorney trustees either reside in Utah or "maintain[] a bona fide office in the state." 2002 Utah Laws ch. 209 § 1. The amendment defined a *bona fide office* as a physical office open to the public and staffed during regular business hours, at which a trustor could request information and deliver funds in person. Mr. Kleinsmith again challenged the statute's constitutionality and again prevailed, this time on the ground that it violated the federal Constitution's dormant Commerce Clause by discriminating against out-of-state economic interests. *See Kleinsmith v. Shurtleff*, No. 2:03-CV-63TC, slip op. at 1–2 (D. Utah July 3, 2003).

In response, the Utah legislature amended the statute a third time. *See* 2004 Utah Laws ch. 177 § 1. Since May 2004 the law has required Utah-licensed attorneys who wish to act as trustees of trust deeds to

> maintain[] a place within the state where the trustor or other
> interested parties may meet with the trustee to:
>> (A) request information about what is required to reinstate or
>> payoff the obligation secured by the trust deed;
>> (B) deliver written communications to the lender as required
>> by both the trust deed and by law;
>> (C) deliver funds to reinstate or payoff the loan secured by the
>> trust deed; or
>> (D) deliver funds by a bidder at a foreclosure sale to pay for
>> the purchase of the property secured by the trust deed.

Utah Code Ann. § 57-1-21(1)(a)(i).[1]  The statute does not further define *maintain*

or *place*.  Although the term is no longer relevant to attorney trustees, the statute

---

[1]Section 57-1-21(1) states in full:

(1)(a) The trustee of a trust deed shall be:

> (i) any active member of the Utah State Bar who maintains a place within the state where the trustor or other interested parties may meet with the trustee to:
>> (A) request information about what is required to reinstate or payoff the obligation secured by the trust deed;
>> (B) deliver written communications to the lender as required by both the trust deed and by law;
>> (C) deliver funds to reinstate or payoff the loan secured by the trust deed; or
>> (D) deliver funds by a bidder at a foreclosure sale to pay for the purchase of the property secured by the trust deed;
> (ii) any depository institution as defined in Section 7-1-103, or insurance company authorized to do business and actually doing business in Utah under the laws of Utah or the United States;
> (iii) any corporation authorized to conduct a trust business and actually conducting a trust business in Utah under the laws of Utah or the United States;
> (iv) any title insurance company or agency that:
>> (A) holds a certificate of authority or license under Title 31A, Insurance Code, to conduct insurance business in the state;
>> (B) is actually doing business in the state; and
>> (C) maintains a bona fide office in the state;
> (v) any agency of the United States government; or
> (vi) any association or corporation that is licensed, chartered, or regulated by the Farm Credit Administration or its successor.
(b) For purposes of this Subsection (1), a person maintains a bona fide office within the state if that person maintains a physical office in the state:
> (i) that is open to the public;
> (ii) that is staffed during regular business hours on regular business days; and
> (iii) at which a trustor of a trust deed may in person:
>> (A) request information regarding a trust deed; or
>> (B) deliver funds, including reinstatement or payoff funds.

retains its definition of *bona fide office*, *see id.* at § 57-1-21(1)(b), because a title-insurance company is required to have one to qualify as a trustee of trust deeds, *see id.* at § 57-1-21(1)(a)(iv)(C).

Mr. Kleinsmith filed this suit in May 2006. Two weeks later he moved for summary judgment. He asserted that certain facts were undisputed but did not submit affidavits or other evidence in support of his motion. The Attorney General filed his own motion for summary judgment. After a hearing the district court denied Mr. Kleinsmith's motion and granted the Attorney General's. Mr. Kleinsmith filed a motion to reconsider in which he raised for the first time an argument that the statute is unconstitutionally vague. The court denied the motion.

## II.    DISCUSSION

We review de novo a district court's decision to grant summary judgment, viewing all facts in the light most favorable to the party opposing summary judgment. *See Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004). We will affirm a grant of summary judgment if there is no genuine issue of material fact and the prevailing party is entitled to judgment under the law. *See id.* at 426; Fed. R. Civ. P. 56(c).

### A.    Due Process (Vagueness)

Section 57-1-21(1)(a)(i) requires an attorney trustee to "maintain[] a place within the state where the trustor or other interested parties may meet

with the trustee to" request information or deliver funds or written communications.  The term *maintain a place* is not defined in the statute.  About all that we can readily infer is that maintaining a place is less onerous than maintaining a bona fide office, as required by the previous version of the statute, which was amended in response to Mr. Kleinsmith's successful challenge to its bona-fide-office requirement.  The statute, both before and after the most recent amendment, defines a *bona fide office* as

> a physical office in the state . . . that is open to the public; . . . staffed during regular business hours on regular business days; and . . . at which a trustor of a trust deed may in person:  . . . request information regarding a trust deed; or . . . deliver funds, including reinstatement or payoff funds.

Utah Stat. Ann. § 57-1-21(1)(b).  The district court's opinion granting summary judgment did not attempt to provide a complete definition of *maintain a place*, but it offered the following observations when addressing Mr. Kleinsmith's Commerce Clause argument:

> [The statute] does not prohibit attorney-trustees from sharing office space or other resources, such as support staff, with other parties. Moreover, [the provision regulating attorney trustees] and the Statute as a whole do not require that the place maintained by attorney-trustees be open to the public during all regular business hours on all regular business days, as required of title-company-trustees, and do not unreasonably restrict out-of-state attorney-trustees from also maintaining a practice or working in other states.

Aplt. App. at 269.  (The court also noted that resident attorney-trustees could use their homes as their "places" under the statute; but it is not clear to us that many

attorneys would wish to disclose their home addresses to people threatened with foreclosure, much less meet them for business at their homes.)

A statute violates the due-process guarantee of the Fourteenth Amendment if it "forbid[s] or requir[es] conduct in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Baggett v. Bullitt*, 377 U.S. 360, 367 (1964). On appeal Mr. Kleinsmith contends that § 57-1-21(1)(a)(i) is void because the word *place* in the statutory text "and as interpreted by [the district court]" is unconstitutionally vague. Aplt. Br. 18. But he did not raise a vagueness challenge in his motion for summary judgment or in his response to Mr. Shurtleff's cross-motion. He first mentioned vagueness in his motion to reconsider the summary judgment against him, and even then it was only a passing reference in his challenge to the district court's rejection of his earlier arguments. The court did not address the issue in its one-page ruling on that motion.

We decline to reach the merits of Mr. Kleinsmith's vagueness claim. His failure to raise a vagueness challenge to the statute before the district court entered summary judgment bars such a challenge on appeal. *See FDIC v. Noel*, 177 F.3d 911, 915 (10th Cir. 1999). Of course, if the district court had exercised its discretion to address that challenge in Mr. Kleinsmith's motion for reconsideration, the matter would be preserved for appeal. *See Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999); *Quest Med., Inc. v.*

*Apprill*, 90 F.3d 1080, 1087 (5th Cir. 1996). But the district court did not do so, which was a proper exercise of its discretion. *See Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1303–04 (10th Cir. 2008). It follows that the claim was not preserved for appeal. *See also Burnette v. Dresser Indus., Inc.*, 849 F.2d 1277, 1285 (10th Cir. 1988) (declining to consider issue that was first raised in district court in motion to reconsider, and which district court did not address); *Iverson v. City of Boston*, 452 F.3d 94, 104 (1st Cir. 2006) ("The presentation of a previously unpled and undeveloped argument in a motion for reconsideration neither cures the original omission nor preserves the argument as a matter of right for appellate review."). Mr. Kleinsmith suggests that only after the district court ruled on the summary-judgment motion could he have raised a claim that the statute *as interpreted by the district court* was unconstitutionally vague. Perhaps he is right, but he did not raise this particular vagueness argument even in his motion to reconsider the summary judgment. Accordingly, we do not address this argument either.

Although we do not consider whether § 57-1-21(1)(a)(i) is unconstitutionally vague, we note that the uncertainty in the provision's meaning lurks over several of Mr. Kleinsmith's remaining arguments. As we shall see, the validity of several of his challenges to the statute depends on the burden that the statute places upon nonresident attorneys—a burden that he must prove to prevail. He has failed to present that proof, perhaps in large part because he has been

unable to show what the statute would require of him. One might say that his constitutional challenges are premature; until there is clarity concerning the statutory command, a proper analysis of the constitutionality of the burden imposed on him is impossible.

## B. Dormant Commerce Clause

The Constitution's Commerce Clause gives Congress the power "[t]o regulate commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate . . . commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). Courts speak of the source of this limitation on state law as the dormant Commerce Clause. *See Dep't of Revenue of Ky. v. Davis*, 128 S. Ct. 1801, 1808 (2008). The Supreme Court's jurisprudence under the dormant Commerce Clause "is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. The point is to effectuate the Framers' purpose to prevent a State from retreating into economic . . . isolation." *Id.* (citations, brackets, and internal quotation marks omitted). The Supreme Court

has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [the Court has] generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, [the Court has] examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578–79 (1986) (citations omitted).

The first-tier inquiry turns on whether the challenged law "affirmatively or clearly discriminates against interstate commerce on its face or in practical effect." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 402 (1994) (internal quotation marks omitted). Discriminatory laws are those that "mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (internal quotation marks omitted). A statute may be neutral in its terms and still discriminate against interstate commerce. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 350–52 (1977) (facially neutral North Carolina statute discriminated against interstate commerce by raising Washington growers' costs of doing business in the state and stripping away the competitive advantage of the Washington grading system).

"The burden to show discrimination rests on the party challenging the validity of the statute." *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). If the challenger succeeds, then "the burden falls on the State to justify [its law] both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Id.* (internal quotation marks omitted). This is no easy task: "A discriminatory law is virtually per se invalid." *Davis*, 128 S. Ct. at 1808 (internal quotation marks omitted).

If the challenged law does not discriminate, the challenger must rely on a second-tier inquiry, which employs the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). That test states that "[the law] will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142. We should note that the Supreme Court has "recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the [*Pike*] balancing approach." *Brown-Forman*, 476 U.S. at 579.

> **1.  Tier One:  Does the Utah Statute Discriminate Against Interstate Commerce?**

Utah Code Ann. § 57-1-21(1)(a)(i) plainly does not discriminate on its face. It requires each Utah attorney acting as a trust-deed trustee, whether the attorney is a resident or a nonresident, to maintain a place.

Mr. Kleinsmith can still prevail, however, if he can show that the statute discriminates in practical effect. "The Supreme Court has not directly spoken to the question of what showing is required to prove discriminatory effect where, as here, a statute is evenhanded on its face." *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36 (1st Cir. 2007). But we agree with the First Circuit that the party claiming discrimination has the burden to put on evidence of a discriminatory effect on commerce that is "significantly probative, not merely colorable." *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 40 (1st Cir. 2005) (internal quotation marks omitted). That party must show "both how local economic actors are favored by the legislation, and how out-of-state-actors are burdened." *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 432 (6th Cir. 2008) (internal quotation marks omitted). Not every benefit or burden will suffice—only one that "alters the competitive balance between in-state and out-of-state firms." *Baldacci*, 505 F.3d at 36; *see West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 196 (1994) (a state law that "cause[s] local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market" is unconstitutional "because it, like a tariff, neutralizes advantages belonging to the place of origin." (brackets and internal quotation marks omitted)); *R & M Oil*

-13-

*& Supply, Inc. v. Saunders*, 307 F.3d 731, 734–35 (8th Cir. 2002) (Illinois-based propane seller failed to present sufficient evidence that Missouri statute requiring sellers to have in-state propane-storage facility put it at competitive disadvantage); *see also Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 260–70 (3d Cir. 2006) (out-of-state challenger failed to show that Pennsylvania milk-pricing scheme negated its competitive advantage); *cf. Granholm*, 544 U.S. at 473–74 (holding discriminatory a law that required out-of-state wine, but not in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers, adding "two extra layers of overhead" and thus a "cost differential . . . [that] can effectively bar small [out-of-state] wineries from the Michigan market.").

We think it instructive to see how the presentation of evidence led to opposite results in *Baldacci* and *Lilly*, which involved challenges to state laws regulating direct sales by wineries to consumers. The Maine law challenged in *Baldacci* allowed a small winery (a "farm winery") to sell its products directly to consumers (bypassing the otherwise mandatory distribution chain through a licensed wholesaler and a licensed retailer) in face-to-face transactions on its premises and at up to two off-site locations established by the winery within Maine. *See* 505 F.3d at 30–31. A farm-winery license was available on equal terms to Maine and out-of-state wineries. *See id.* The out-of-state wineries claimed that the Maine statute discriminated against interstate commerce by

preventing them from selling their wines directly to Maine consumers. *See id.* at

31–32. The First Circuit rejected the challengers' claim under the dormant

Commerce Clause because they had "proffered no evidence that permitting farm

wineries to sell only face to face, either on premises or at approved in-state

locations, discriminates against interstate commerce." *Id.* at 36. They had not

produced evidence that "Maine law acts to protect Maine vineyards or that Maine

consumers substitute wines purchased directly from Maine vineyards for wines

that they otherwise would have purchased from out-of-state producers"; that "any

wines at all are purchased by consumers directly from Maine vineyards"; or that

the law "somehow alters the competitive balance between in-state and out-of-state

firms." *Id.* The court continued:

> [P]laintiffs have adduced no evidence that would in any way
> undermine the plausible impression that Maine consumers (like
> imbibers everywhere) view trips to a winery as a distinct experience
> incommensurate with—and, therefore, unlikely to be replaced by—a
> trip to either a mailbox or a retail liquor store. Nor have they offered
> evidence to impeach the suggestion, made in one of the cases on
> which they rely, that bottles of wine are unique and, thus, unlikely to
> be perceived by consumers as interchangeable.

*Id.* at 37 (citation and footnote omitted).

In *Lilly*, by contrast, the challengers (one of whom had also been a plaintiff

in *Baldacci*) made an evidentiary showing of the discriminatory effect of

Kentucky's law permitting licensed small wineries, whether in-state or

out-of-state, to ship wine directly to consumers (thus bypassing wholesalers and

-15-

retailers) but only if the consumer purchased the wine in person at the winery. 553 F.3d at 427–28. The evidence showed that in Oregon, the home of Cherry Hill Vineyards, only 13 of the 300 wineries marketed their wine in Kentucky, and most of the 300 were small. *See id.* at 432. Because it is not economical for a wholesaler to carry the products of a small winery, many were "foreclosed from the Kentucky market altogether unless they [could] take orders directly from Kentucky residents and ship wine." *Id.* at 433. In particular, "Cherry Hills aver[red] that in order to distribute their wine through a wholesaler, they and other wineries pay up to 50% of their profits to the wholesaler, which can result in a profit differential of $10-15 per bottle of wine." *Id.* And some Kentucky residents stated that they "would buy wines directly from out-of-state wineries but for the in-purchase requirement." *Id.* The court also relied on "a Federal Trade Commission . . . report which concluded that state laws like Kentucky's, which prevent direct sales and force producers to use wholesalers, create an anticompetitive barrier to e-commerce for small wineries." *Id.* The Sixth Circuit concluded that "Plaintiffs have presented specific evidence that meets the[ir] burden . . . . Plaintiffs have demonstrated that the challenged statutes discriminate against interstate commerce in practical effect." *Id.*

Unlike the challengers in *Lilly*, and like the challengers in *Baldacci*, Mr. Kleinsmith has not presented evidence that could satisfy his burden to establish a discriminatory effect of § 57-1-21(1)(a)(i). His statement of

-16-

undisputed facts in support of his motion for summary judgment fails to show how the statute has affected his ability (or the ability of nonresident attorneys generally) to compete in the Utah market. With regard to economic loss attributable to the law, he says: "From 1998-2001, [my] volume [of Utah foreclosure work] was good[,] generating $50,000 plus per year in gross income. Since 2001, volume has declined. . . . Since 2002, volume and dollar revenue has decreased further because of the changes in Utah's statutes in question herein." Aplt. App. at 138. But the period of time he describes includes the effective dates of the two amendments to § 57-1-21(1)(a)(i) that have been stricken in prior litigation. Mr. Kleinsmith provides no insight into the effect of the May 2004 amendment whose constitutionality we must decide. In particular, he fails to say that he has so much as investigated the costs of complying with the present statute—for example, by making arrangements (perhaps with Utah clients) to "maintain a place" in compliance with the Utah statute.

Perhaps more importantly, Mr. Kleinsmith has not shown how the 2004 law alters the competitive balance between resident and nonresident attorneys. Even if he had made a competent showing of his own economic loss attributable to the law, he would still need to show a discriminatory effect upon interstate commerce in attorney-trustee services as a whole. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), is instructive. The Court in that case considered a dormant Commerce Clause challenge to a Maryland statute that prohibited producers and

-17-

refiners of petroleum products from operating retail service stations within the state.  *See id.* at 119.  Among the challengers were out-of-state refiners who sold their gasoline in Maryland only through stations that they owned.  *See id.* at 122.  They pointed to evidence that the statute would cause them to discontinue selling in Maryland.  *See id.* at 127.  The Supreme Court was not impressed, because the fate of a single interstate business, or even a class of such businesses, was not dispositive.  Maryland did not produce or refine any petroleum products.  *See id.* at 123.  The Court said:

> Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners.  The source of the consumers' supply may switch from company-operated stations to independent dealers, but *interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another*.

*Id.* at 127 (emphasis added).  In language that we find applicable here, the Court explained:  "We cannot . . . accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market. . . .  [T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."  *Id.* at 127–28.  *See Brown & Williamson Tobacco Co. v. Pataki*, 320 F.3d 200, 212–13 (2d Cir. 2003).  In light of *Exxon*, Mr. Kleinsmith should at least have produced evidence that the work he had performed was now being done by attorneys who are

residents of Utah. Yet, he appears to claim precisely the opposite. His opening brief in our court asserts that he has lost his Utah work to a "national group[]" of lawyers. Aplt. Br. at 5. Accordingly, we conclude that Mr. Kleinsmith has failed to carry his burden of proving that the Utah statute is discriminatory in practical effect.

### 2. Tier Two: *Pike* Balancing

We turn next to Mr. Kleinsmith's argument that the Utah statute excessively burdens interstate commerce under the *Pike* balancing test. A statute violates the dormant Commerce Clause if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* The person challenging the statute bears the burden of establishing a *Pike* violation. *See Dorrance v. McCarthy*, 957 F.2d 761, 763 (10th Cir. 1992).

Mr. Kleinsmith has failed to make the necessary showing. The Attorney General asserts that the statute makes trust-deed trustees more accessible to Utahns going through nonjudicial foreclosure. Not only has Mr. Kleinsmith failed to present any evidence to challenge this benefit, but, as noted in the prior section of this opinion, he also has not produced evidence of any burden that the

challenged law imposes on interstate commerce. As a fellow circuit recently observed:

> Any balancing approach, of which *Pike* is an example, requires evidence. It is impossible to tell whether a burden on interstate commerce is clearly excessive in relation to the putative local benefits without understanding the magnitude of both burdens and benefits. Exact figures are not essential (no more than estimates may be possible) and the evidence need not be in the record if it is subject to judicial notice, but it takes more than lawyers' talk to condemn a statute under *Pike*.

*Baude v. Heath*, 538 F.3d 608, 612 (7th Cir. 2008) (citations and internal quotation marks omitted). Absent an evidentiary basis for concluding that the Utah statute fails the *Pike* balancing test, we must reject Mr. Kleinsmith's challenge under the dormant Commerce Clause.

## C. Privileges and Immunities Clause

Article IV's Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. In applying the Clause, the Supreme Court has equated citizenship with residence. *See Sup. Ct. of Va. v. Friedman*, 487 U.S. 59, 64 (1988). "[T]he purpose of that clause . . . is to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed." *Toomer v. Witsell*, 334 U.S. 385, 398 (1948). That is, denial of a privilege or immunity to nonresidents "is invalid unless (i) there is a substantial

reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Barnard v. Thorstenn*, 489 U.S. 546, 552 (1989) (internal quotation marks omitted).

Mr. Kleinsmith contends that the maintain-a-place requirement of § 57-1-21(1)(a)(i) violates the Clause by discriminating against nonresident attorneys. Invoking the district court's suggestion in its summary-judgment ruling that an attorney-trustee could comply with the statute by using his home as a "place," he emphasizes that this alternative is not available to nonresident attorneys who, by definition, lack a Utah residence. He further argues that there is no substantial reason for this discrimination; that it does not relate closely to a legitimate state objective because an attorney-trustee whose office lies in a neighboring state may be geographically closer to a Utahn going through foreclosure than a trustee whose office is in a distant part of Utah; and that nondiscriminatory alternative means—for example, requiring attorney-trustees to have toll-free telephone and fax lines—could have been chosen by the legislature.

We assume, without deciding, that the opportunity to serve as a trust-deed trustee in Utah is a privilege protected by the Privileges and Immunities Clause. *See Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 280–81 (1985) (practice of law is privilege protected by the Clause). Nevertheless, we hold that there has been no violation of that Clause here. The problem for Mr. Kleinsmith is that Utah has not deprived him of any privilege granted its citizens. Section 57-1-21(1)(a)(i)

-21-

does not create a residency classification. Resident and nonresident attorney trustees alike are subject to the same requirement: they must maintain a place in Utah where the trustor can meet with the trustee to request information and deliver money and documents. The Supreme Court has never employed the Privileges and Immunities Clause to invalidate a generally applicable law (one that does not treat different classes of persons differently), or even suggested that it might do so. Of course, it may be more difficult, more burdensome, for a nonresident than a resident to comply with a generally applicable law. Indeed, one would think that typically it is harder for a nonresident to conduct a business or profession in a state than it is for a resident simply because of the distance involved; and that was certainly true when the Constitution was adopted. The Privileges and Immunities Clause does not promise nonresidents that it will be as easy for them as for residents to comply with a state's law; it merely protects nonresidents from legal classifications that treat them more harshly (without justification).

Thus, the cases in which the Supreme Court has stricken a state law under the Privileges and Immunities Clause have generally involved laws that classify residents and nonresidents differently. For example, in *Toomer*, 334 U.S. 385, the Court invalidated a South Carolina statue that exacted from nonresident shrimp fishermen a license fee 100 times that charged to South Carolinians. In *Doe v. Bolton*, 410 U.S. 179 (1973), the unconstitutional statute forbade nonresident

women from having an otherwise lawful abortion in Georgia. In *Austin v. New Hampshire*, 420 U.S. 656 (1975), only nonresidents were subject to a tax on income earned within New Hampshire. In *Hicklin v. Orbeck*, 437 U.S. 518 (1978), an invalid state law gave preference to state residents in employment in the oil-and-gas industry. And in *Piper*, 470 U.S. 274, the Supreme Court invalidated New Hampshire's rule that made nonresidents ineligible to join the state's bar. *See also Nelson v. Geringer*, 295 F.3d 1082 (10th Cir. 2002) (striking a Wyoming statute that barred nonresidents from serving as assistant adjutant generals in the state's national guard).

This is not to say that a statute's classification must be expressed in terms of citizenship or residency to violate the Privileges and Immunities Clause. In *Chalker v. Birmingham & Nw. Ry. Co.*, 249 U.S. 522 (1919), the Supreme Court considered a Tennessee law that taxed persons involved in railroad construction at a higher rate if their principal offices lay outside the state. The Court held that the differential tax violated the Clause because "the chief office of an individual is commonly in the state of which he is a citizen" and thus the challenged tax "[p]ractically . . . would produce discrimination against citizens of other states by imposing higher charges against them than citizens of Tennessee are required to pay." *Id.* at 527. "[A] citizen of one state is guaranteed the right to enjoy in all other states equality of commercial privileges with their citizens," it continued, "but he cannot have his chief office in every one of them." *Id.*

A similar issue arose in the more recent case of *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59 (2003). Owners of dairies located outside California contended that a California milk pooling plan violated the Privileges and Immunities Clause. They argued to the Ninth Circuit that the plan "discriminate[d] against those who produce milk out-of-state which, for all intents and purposes, means those who are residents of other states." *Ponderosa Dairy v. Lyons*, 259 F.3d 1148, 1156 (9th Cir. 2001); *see id.* at 1151–52 (describing the plan). The circuit court rejected the challenge. "There is . . . no violation," it said, "because the classifications . . . are based on the location where milk is produced." *Id.* The plan "d[id] not, on [its] face, create classifications based on any individual's residency or citizenship." *Id.* Relying on *Chalker*, the Supreme Court reversed. Without reaching the merits, the Court said that a law may violate the Privileges and Immunities Clause even if the challenged classification in the law does not refer to residency or citizenship. *See Lyons*, 539 U.S. at 67. The Court noted that the classification struck down in *Chalker* was based, not on citizenship or residence, but on the location of the person's principal place of business. It continued:

> Whether *Chalker* should be interpreted as merely applying the Clause to classifications that are but proxies for differential treatment against out-of-state residents, or as prohibiting any classification with the practical effect of discriminating against such residents, is a matter we need not decide at this stage of these cases.

-24-

*Id.* As we understand *Lyons*, the lower court's error was in holding that a classification is subject to the Privileges and Immunities Clause only if it is explicitly based on citizenship or residency. The Supreme Court's point was that another ground for classification may create a Privileges and Immunities Clause violation if that ground is just a proxy for residence or is so connected to residence that the classification necessarily imposes discriminatory burdens on nonresidents.

We must not read too much into *Chalker* and *Lyons*. Yes, a state cannot avoid Privileges and Immunities Clause review of its law by eschewing the words *residence* or *citizenship* and their derivatives. But there still needs to be a classification—a classification that creates a difference in status for residents and nonresidents. There is no such classification in § 57-1-21(1)(a)(i). *All* attorney-trustees—resident and nonresident—must "maintain a place." One could say that attorney-trustees are treated differently from other attorneys or are treated differently from other trustees; but these differences are totally unconnected to residence.

Our view of the Privileges and Immunities Clause finds strong support in the Supreme Court's analysis in *Friedman*, 487 U.S. 59. *Friedman* considered a challenge under the Clause to Virginia's requirement that only residents could be admitted to its bar "on motion" (that is, without passing its bar exam). *Id.* at 61 (internal quotation marks omitted). After concluding that the residency

-25-

requirement deprived qualified nonresidents of the privilege of practicing law in Virginia "on terms of substantial equality with [Virginia] residents," *id.* at 66, the Court turned to the state's contentions that substantial reasons justified the disparity in treatment and that the discrimination bore a close relation to those reasons. The Court stated that this inquiry focuses on "whether, within the full panoply of legislative choices otherwise available to the State, there exist alternative means of furthering the State's purpose without implicating constitutional concerns," *id.* at 67. It rejected Virginia's argument that the residency requirement was the least problematic means of ensuring an attorney's "commitment to service and familiarity with Virginia law." *Id.* at 68. The state could protect these interests, concluded the Court, by, for example, mandating that attorneys attend continuing-legal-education courses and take on pro bono work. *See id.* at 69. The Court likewise rejected the argument that the residency requirement facilitated enforcement of Virginia's full-time-practice requirement, noting:

> Virginia already requires . . . that attorneys admitted on motion maintain an office for the practice of law in Virginia. . . . [T]he requirement . . . facilitates compliance with the full-time practice requirement in nearly the identical manner that the residency restriction does, rendering the latter restriction largely redundant. The office requirement furnishes an alternative to the residency requirement that is not only less restrictive, but also is fully adequate to protect whatever interest the State might have in the full-time practice restriction.

*Id.* at 69–70 (citation omitted). The requirements that all attorneys maintain an office and engage in pro bono work are more burdensome to nonresidents than to residents (and the disparity in burdens is certainly greater than the disparity in burdens in "maintaining a place" under Utah's law). Yet the Court assumed without discussion that these uniformly imposed requirements would not pose a problem under the Privileges and Immunities Clause. They must have been "alternative means of furthering the State's purpose without implicating constitutional concerns." *Id.* at 67.

Accordingly, we reject Mr. Kleinsmith's argument under the Privileges and Immunities Clause. It is irrelevant to the Clause whether the practical effect of the maintain-a-place requirement of § 57-1-21(1)(a)(i) burdens nonresidents disproportionately.

Mr. Kleinsmith also invokes the Fourteenth Amendment's Privileges or Immunities Clause. Put aside that the authorities he cites all concern Article IV's Clause. It is well established that the only privileges or immunities protected by the Fourteenth Amendment are those that "owe their existence to the Federal government, its National character, its Constitution, or its laws." *Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36, 79 (1872). Mr. Kleinsmith's challenge implicates no such right. *See Powers v. Harris*, 379 F.3d 1208, 1214 (10th Cir. 2004) (right to pursue an occupation not protected by the Fourteenth Amendment's Privileges

or Immunities Clause); *Merrifield v. Lockyer*, 547 F.3d 978, 982–84 (9th Cir 2008) (same).

**D.    Equal Protection Clause**

The Fourteenth Amendment to the United States Constitution declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1.  Mr. Kleinsmith contends that § 57-1-21(1)(a)(i) violates the Equal Protection Clause by requiring different qualifications of different classes of trust-deed trustees.  The distinction among trustees is not based on an inherently suspect characteristic, such as race or national origin, *see Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008); nor does it burden the exercise of a fundamental right, *see Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n*, 889 F.2d 929, 932 (10th Cir. 1989) ("In the equal protection clause context, the Supreme Court has never recognized a fundamental right to pursue a particular line of employment.");  *Montalvo-Huertas v. Rivera-Cruz*, 885 F.2d 971, 977 n.8 (1st Cir. 1989).  Thus, Mr. Kleinsmith's equal-protection challenge must fail "if the classification drawn by the statute is rationally related to a legitimate state interest."  *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1319 (10th Cir. 2008) (internal quotation marks omitted).  Our review under this rational-basis standard is deferential:

> Governmental bodies have wide latitude in enacting social and
> economic legislation; the federal courts do not sit as arbiters of the
> wisdom or utility of these laws. . . .  [W]e need not satisfy ourselves

that the challenged rules will in fact further their articulated purposes; it is sufficient if the legislature could rationally have concluded that the purposes would be achieved.

*Allright Colo., Inc. v. City & County of Denver*, 937 F.2d 1502, 1512 (10th Cir. 1991) (citations and internal quotation marks omitted).

The statute readily survives this test. Making it easier for Utahns to meet with trustees, who play a pivotal role in nonjudicial foreclosures, is a legitimate state interest. And Utah's legislature could rationally have concluded that this interest would be served by requiring attorney-trustees to maintain a place within Utah for meeting with trustors and other interested persons.

Mr. Kleinsmith's arguments to the contrary are unpersuasive. He first argues that we should not apply rational-basis scrutiny to his equal-protection challenge because the statute violates the constitutional provisions that are the subjects of his other challenges—Article IV's Privileges and Immunities Clause, the Fourteenth Amendment's Privileges or Immunities Clause, the dormant Commerce Clause, and the Due Process Clause. But, as explained above, these other constitutional challenges fail.

Mr. Kleinsmith's other argument is that the Utah statute's true aim is to harm an "unpopular group, out-of-state Attorneys," and that such an aim is barred by *Romer v. Evans*, 517 U.S. 620 (1996). Aplt. Br. at 35. *Romer* struck down on equal-protection grounds a Colorado constitutional amendment that forbade every branch of state government from enacting any law or pursuing any policy to

-29-

protect gays and lesbians from discrimination. 517 U.S. at 635. The Court said that (1) Colorado's imposition of a "broad and undifferentiated disability on a single named group" was an "invalid form of legislation"; and (2) the amendment's "sheer breadth [was] so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests." *Id.* at 632. In accordance with circuit precedent, however, we reject Mr. Kleinsmith's *Romer* argument. In *Powers*, 379 F.3d at 1223–25 & n.20, we considered an equal-protection claim by persons who sought to sell caskets within Oklahoma over the Internet. We held that *Romer* (and its apparent heightened rational-basis review) does not apply to state economic regulation. *See id.* at 1224–25. We therefore need not pursue any further analysis under *Romer* on this appeal.

In sum, the Utah statute withstands Mr. Kleinsmith's equal-protection challenge.

## III. CONCLUSION

We AFFIRM the judgment of the district court.