Filed 1/26/22 Stop Qip Tax Coalition v. Dept. of Food and Agr. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| STOP QIP TAX COALITION, | C092810 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201980003273CUWMGDS) |
| v. | |
| DEPARTMENT OF FOOD AND AGRICULTURE, | |
| Defendant and Respondent; | |
| SAVE QIP DAIRY FARMERS, | |
| Intervener and Respondent. | |

This appeal concerns a matter of statutory interpretation. Anticipating the United States Department of Agriculture (federal agency) might promulgate a federal milk marketing order (federal order) covering California, the California Department of Food and Agriculture (department) sponsored Food and Agricultural Code[1] (the Code) section

---

[1] All further section references are to the Food and Agricultural Code unless otherwise specified.

62757, which was enacted by the Legislature without any modification.  Section 62757 was added to chapter 3.5 of part 3 of division 21 of the Code.[2]

Subdivision (a) of section 62757 provides, in pertinent part, "[i]f a federal milk marketing order is established in California, the secretary [of the department] is authorized to establish a stand-alone quota program, the details of which shall be included in the pooling plan."  Subdivision (c) of section 62757 states, "The stand-alone quota program shall be pursuant to a recommendation by the review board established pursuant to Section 62719 and approved by a statewide referendum of producers conducted pursuant to Sections 62716 and 62717."

Pursuant to section 62757, the review board recommended, the department approved, and the dairy producers adopted by referendum the Quota Implementation Plan.  The Quota Implementation Plan states:  "It is the intent of the Legislature that the Department implements [*sic*] a stand-alone quota plan, adopted by producer referendum, only if and when [the federal agency] adopts a [federal order] for California.  The 'pooling plan' referenced in the Trailer Bill (Section 62757 of the Food & Ag Code) means this Plan."  The federal agency later issued a final rule promulgating a federal order covering California, with an implementation date of November 1, 2018.  (Milk in California; Federal Milk Marketing Order Promulgation, 83 Fed.Reg. 26547 et seq. (June 8, 2018) (Final Rule).)

Plaintiff Stop QIP Tax Coalition asserts the Quota Implementation Plan is procedurally deficient.  Plaintiff believes the Legislature's reference to "the pooling plan" in section 62757, subdivision (a) and its incorporation of the statutes enumerated in section 62757, subdivision (c) required the department to amend the then-existing California milk pooling plan (previously adopted and implemented pursuant to chapter 3)

---

[2]    All further chapter references are to chapters contained in part 3 of division 21 of the Code.

to include the stand-alone quota program -- a process that would have required a public hearing. We conclude section 62757, while certainly not a model of clarity, imposes no such requirement. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Prior to November 1, 2018,[3] "California ha[d] operated a unique milk price stabilization and marketing program since the 1930's. The program classifie[d] milk products into five categories: Class 1 includes fluid products such as the several varieties of milk; Class 2 includes yogurt, cottage cheese and heavy cream; Class 3 includes frozen milk products; Class 4a includes butter and non-fat dry milk; and Class 4b includes cheeses. The program establishe[d] minimum prices for raw milk depending upon the class of product for which the milk w[ould] be used. The program was created to address destructive trade practices that resulted because processors that predominantly made Class 1 products could afford to pay more for raw milk than could processors making other classes of products.

"The California [L]egislature enacted the Gonsalves Milk Pooling Act of 1967[4] to address market disparities that resulted from the existing price stabilization and marketing program. California's pooling plan s[ought] to eliminate pricing inequalities by pooling the revenues generated by the sale of raw milk and redistributing the revenues among all producers according to a blended price that [wa]s based on milk usage across the state regardless of the use for which a particular producer's milk [wa]s purchased. At the same time, the minimum prices that [we]re used to calculate each processor's obligation to the pool for raw milk ('pool obligation') var[ied] according to the end-product produced. Accordingly, Class 1 processors typically ha[d] a larger pool

---

[3] The California federal order was effective October 17, 2018, but started to apply to affected parties on November 1, 2018. (Final Rule, *supra*, 83 Fed.Reg. at 26547.)

[4] The Gonsalves Milk Pooling Act is contained in chapter 3 (§§ 62700-62731).

3

obligation than . . . processors of other end products.  In sum, the pooling system reduce[d] the competition among dairy farmers for contracts with Class 1 processors and reduce[d] the incentives Class 1 processors ha[d] to extract concessions from the dairies that suppl[ied] their milk.

"The pooling plan redistribute[d] the pooled revenues according to a quota system that include[d] both a quota and an over-base price.  California producers [we]re allocated quota share based upon their historic Class 1 milk production.  Quota shares c[ould] also be purchased from other producers.  Owning quota [wa]s beneficial because quota price exceed[ed] overbase price by [a certain amount per] hundredweight and producers [we]re paid at quota price for milk contributed to the pool up to the amount of quota shares they own[ed].  The lesser, overbase price [wa]s paid for milk contributed to the pool in excess of quota.  Consequently, many producers ha[d] elected to purchase quota shares in order to maximize the price they receive[d] for their raw milk.

"Each month, the [department] calculate[d] the gross amount each processor owe[d] its various producers.  Processors [we]re authorized to subtract from the gross amounts certain deductions such as transportation and regional quota allowances.  Where the total value of milk that a processor use[d] [wa]s greater than the amount the processor owe[d] its producers, the processor pa[id] the difference into the pool equalization fund.  Conversely, a processor [wa]s paid from the pool equalization fund when the total amount the processor owe[d] its producers exceed[ed] the value of the milk it used." (*Ponderosa Dairy v. Lyons* (9th Cir. 2001) 259 F.3d 1148, 1151-1152, revd. on other grounds in *Hillside Dairy, Inc. v. Lyons* (2003) 539 U.S. 59 [156 L.Ed.2d 54].)

In the Gonsalves Milk Pooling Act, the Legislature anticipated the federal agency might at some point adopt a federal order covering California.  In that regard, section 62726 provides:  "Notwithstanding other laws to the contrary, in the event a milk marketing order under the jurisdiction of the United States Department of Agriculture or other appropriate federal agency, is created by referendum or under the applicable laws

4

and procedures relating thereto, in this state or in any geographical area within this state, the provisions of this chapter or any part thereof which is in conflict with such federal order, or which is unnecessary or is a duplication thereof, shall be suspended in the geographical area covered by and during the existence of such federal order.  The director[5] shall take such steps and procedures as are necessary to wind up and conclude the administration and enforcement of the provisions of this chapter, or any part thereof, prior to the suspension date."  Section 62728 further provides:  "The director shall terminate any pooling plan in effect in any marketing area without notice or hearing at any time that there ceases to be a stabilization and marketing plan in force and effect in such marketing area, establishing minimum prices to be paid to producers, unless minimum prices payable by distributors to producers for fluid milk in such marketing area are subject to a federal milk marketing agreement or order which is not in conflict with, or in duplication of, the pooling plan."

In early 2015, three dairy producer cooperatives petitioned the federal agency to consider creating a federal order in California.  The federal agency granted the petition and conducted a public hearing in late 2015.  On February 14, 2017, the federal agency announced a recommended decision to establish a federal order in California.  (Milk in California; Recommended Decision and Opportunity To File Written Exceptions on Proposal To Establish a Federal Milk Marketing Order, 82 Fed.Reg. 10634 et seq. (Feb. 14, 2017) (Recommended Decision).)  The Recommended Decision included provisions related to the establishment of minimum regulated prices for farm milk and a pooling program to distribute the revenue from milk sales.  (*Id*. at 10634.)

---

**5**    The references to director in the Code are to the department's secretary.  (See *Delano Farms Co. v. California Table Grape Com.* (2018) 4 Cal.5th 1204, 1244, fn. 6 [director was the department's secretary's former title].)

The federal agency noted the "California State Order" implemented by the department "is codified in the *Pooling Plan for Market Milk*, as amended, and in two *Stabilization and Marketing Plan(s) for Market Milk*, as amended, for the Northern and Southern California marketing areas." (Recommended Decision, *supra*, 82 Fed.Reg. at 10639.) The federal agency explained the "California State Order" "is similar to the recommended [federal order] in most respects. California handlers currently report milk receipts and utilization to [the department], which calculates handler prices based on component values derived from finished product sales surveys. Likewise, [federal order] handlers report milk receipts and utilization to the Market Administrators, who calculate handlers' pool obligations according to price formulas that incorporate component prices based on end product sales values. Under both programs, the value of handlers' milk is pooled, and pool revenues are shared by all the pooled producers." (*Id*. at 10636.) However, "[t]he [federal order] would not provide for the quota and non-quota milk pricing tiers found under the [California milk pooling plan]. Under the recommended [federal order], regulated handlers would be allowed to deduct monies, in an amount determined and announced by [the department], from blend prices paid to California dairy farmers for pooled milk and send those monies to [the department] to administer the quota program." (*Ibid*.)

The federal agency announced: "This decision finds that the California quota program should remain a function of [the department] in whatever manner [the department] deems appropriate. Should [the department] continue to use producer monies to fund the quota program, this decision finds that the proper recognition of quota values within a California [federal order] . . . is to permit an authorized deduction from payment to producers, in an amount determined and announced by [the department]." (Recommended Decision, *supra*, 82 Fed.Reg. at 10634.) The federal agency recommended adding section 1051.11 to title 7 of the Code of Federal Regulations, as follows: "*California Quota Program* means the applicable provisions of the California

6

Food and Agriculture [*sic*] Code, and related provisions of the pooling plan administered by the [department]." (*Id.* at 10684.)

On March 16, 2017, the department sent a letter to the dairy industry notifying the industry the federal agency had published the Recommended Decision to establish a federal order for California, but the federal order would not incorporate quota. The department explained the federal order "would necessitate quota to operate independently of [the federal order] as a stand-alone program, administered by the [department]" and it had issued a statement at the federal agency's public informational meeting that the department would review its existing legislative authority to determine whether it could administer a stand-alone quota program, independent of a pricing and pooling scheme.

On May 12, 2017, the department's secretary advised the federal agency that, "to ensure a stand-alone quota program is not disrupted, it is necessary to remove any statutory ambiguity that may exist in California's statutes. Therefore, it is the [department's] intention to sponsor legislation to ensure the proper authority lies with the department, convene the Producer Review Board (Board), pursuant to . . . section 62719, develop the necessary details for a stand-alone quota program, and hold a producer referendum on the Board's recommendations."

In his declaration, Jim Houston, who served as the department's undersecretary from January 2015 to September 30, 2017, declared he was the sole drafter of section 62757, which he referred to as the "2017 Trailer Bill."[6] Houston drafted section 62757, subdivision (a) to state " 'the details of [the stand-alone quota program] shall be included in the pooling plan' after consultation with [the department's] legal staff, because the recommended [federal order] defined the stand-alone quota program as consisting of 'the

---

[6] Plaintiff raised several objections to various portions of Houston's declaration in the trial court, all of which were sustained. We do not recite any of the challenged statements.

7

applicable provisions of the [Food and Agricultural Code], and related provisions of the pooling plan administered by the [department].' " Houston presented testimony in support of the sponsored legislation at two legislative subcommittee hearings and stated he believed "the 2017 Trailer Bill was universally viewed as a noncontroversial bill, and thus [it] received little legislative scrutiny."

The Assembly Budget Subcommittee No. 3 on Resources and Transportation considered the draft legislation on May 16, 2017. The report attached to the agenda states, in pertinent part: "In February 2017, the [federal agency] recommended establishing a federal order that would incorporate California dairy. [The federal agency] is now in the process of taking public comments on the recommendation. [The federal agency] is scheduled to host an official vote of California dairy farmers between late fall of 2017 and early spring of 2018 on whether to join the federal order. If California dairy farmers choose to join the federal order, the existing California milk pricing system (which includes a quota system) would be repealed, but there would be no quota system under the federal order. California dairy farmers may be interested in maintaining a California-specific quota system (in addition to the federal order).

"The proposed trailer bill language would authorize [the department] to establish a California-specific quota system contingent upon approval through a dairy farmer referendum. According to [the department], it is important for dairy farmers to know whether [the department] has authority to implement a California-specific quota system before a vote is taken on whether to join the federal order. Dairymen and processors operate based on strategic financial forecasting, which includes quota as a significant variable. Without state authority being explicit prior to the conducted vote by [the federal agency], such financial forecasting would not be possible." (Assem. Budget Subcom. No. 3 on Resources and Transportation, Rep. on Milk Pooling Trailer Bill Language, May 16, 2017, pp. 41-42.)

8

The Senate Budget and Fiscal Review Subcommittee No. 2 considered the draft legislation on May 18, 2017. The report attached to the agenda states, in pertinent part: "In February 2017, the [federal agency] recommended establishing a federal order that would incorporate California dairy. [The federal agency] is now in the process of taking public comments on the recommendation. [The federal agency] is scheduled to host an official vote of California dairy farmers between late fall of 2017 and early spring of 2018 on whether to join the federal order.

"If California dairy farmers choose to join the federal order, the existing California milk pricing system (which includes a quota system) would be repealed, but there would be no quota system under the federal order. California dairy farmers may be interested in maintaining a California-specific quota system (in addition to the federal order).

"The proposed trailer bill language would authorize [the department] to establish a California-specific quota system contingent upon approval through a dairy farmer referendum. According to [the department], it is important for dairy farmers to know whether [the department] has authority to implement a California-specific quota system before a vote is taken on whether to join the federal order." (Sen. Budget and Fiscal Review Subcom. No. 2, Rep. on Milk Pooling Trailer Bill Language, May 18, 2017, p. 16.)

The Legislature made no changes to the draft legislation and enacted section 62757 as proposed, effective June 27, 2017. (Stats. 2017, ch. 26, § 38.) Section 62757 was added to chapter 3.5.

On September 21, 2017, the department's secretary approved the recommended Quota Implementation Plan, as proposed by the producer review board. The producer review board had conducted four public meetings and had received input from the public and technical assistance from department staff in preparing the document.

On October 6, 2017, the department's acting chief of the milk pooling branch sent a letter to California milk producers, enclosing the proposed Quota Implementation Plan

9

and a ballot for voting on whether to adopt it.  The letter provided:  "If the proposed [Quota Implementation Plan] is approved, the existing Pool Plan for Market Milk will remain in effect.  If a [federal order] is promulgated in California, at that time the [federal order] and the [Quota Implementation Plan] would become effective."  On January 5, 2018, the department certified that the eligible milk producers voted in favor of adopting the Quota Implementation Plan.

On June 8, 2018, the federal agency issued its final rule promulgating the federal order for California.  (Final Rule, *supra*, 83 Fed.Reg. at 26547 et seq.)  The final rule added section 1051.11 to title 7 of the Code of Federal Regulations, as proposed in the Recommended Decision.  (*Id*. at 26552.)  The final rule provided "[a]ffected parties must comply with all provisions of this rule beginning November 1, 2018."  (*Id*. at 26547.)  In the department's view, the then-existing California pooling plan (previously adopted under chapter 3) was suspended by operation of law under section 62726 on November 1, 2018, because it was inconsistent with the federal order.

Plaintiff filed a verified petition for writ of mandate and complaint for declaratory relief and/or other extraordinary relief against the department (petition), seeking to invalidate the Quota Implementation Plan.  Plaintiff argued the Quota Implementation Plan was an underground regulation without force or effect because the department failed to hold one or more public hearings during the formulation process.  The trial court denied the petition, finding no merit in plaintiff's contentions.  Plaintiff appeals.

DISCUSSION

We consider questions of statutory interpretation in accordance with well-established principles of statutory construction.  "The settled rules of statutory construction require that we look to the words of the statute itself as the most reliable indicator of legislative intent.  [Citation.]  If the statutory language is ambiguous, the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes.  When the language is

10

susceptible of more than one reasonable interpretation, the court may turn to a variety of extrinsic aids to assist in interpretation, such as the ostensible objects to be achieved by the statute, the evils to be remedied, the legislative history, public policy and the statutory scheme of which the statute is a part. [Citation.] And, in construing statutory language, the court will not adopt an interpretation that would produce absurd consequences." (*Cooley v. Superior Court* (2001) 89 Cal.App.4th 785, 789.) We review de novo the department's interpretation of the statute, upheld by the trial court, while respecting the department's expertise as the agency charged with administering the milk marketing statutory scheme. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8.)

Before we delve into the analysis, we note plaintiff challenges the trial court's reasoning on several grounds. We do not address the arguments as presented because, as explained *ante*, our standard of review is de novo. In that regard, plaintiff believes the Legislature intended for the department to *amend* the then-existing California milk pooling plan to include the stand-alone quota program, and thus the department was required to conduct one or more public hearings in accordance with California Code of Regulations, title 3, section 2080.4, which pertains to hearings to adopt, amend, or terminate stabilization and marketing plans or a milk pooling plan.

The bases for plaintiff's interpretation appear to be: (1) the Legislature's use of the words "included in the pooling plan" in section 62757, subdivision (a) must necessarily refer to the pooling plan adopted and implemented under chapter 3; (2) section 62757, subdivision (c) incorporates the hearing provisions in sections 62716 and 62717, and the long-standing history that a hearing is required in accordance with California Code of Regulations, title 3, section 2080.4 when the pooling plan is adopted, amended, or terminated; and (3) section 62757, subdivision (c) incorporates section 62719, which establishes the review board, and the review board "exists *only* to 'advise' [the department] 'in the administration of *the pool plan*.' "

11

We first consider whether section 62757, subdivision (c) imposes a hearing requirement on the department by providing the stand-alone quota program shall "be approved by a statewide referendum of producers conducted pursuant to Sections 62716 and 62717." We conclude it does not. To find otherwise, we would have to add language to the statute or disregard the Legislature's "statewide referendum" limiting language. We will do neither.

Section 62716 states that, "[f]ollowing the required hearing, the director shall submit the pooling plan to producers concerned for their approval or disapproval in a statewide referendum" and then prescribes certain requirements as to the referendum. Section 62717 prescribes the votes required for approval of "the proposed pooling plan" and, pertinent to plaintiff's argument, states the secretary may amend or terminate "the plan" "after notice and public hearing has been given in the same manner as is provided in Chapter 2 (commencing with Section 61801) for stabilization and marketing plans." Plaintiff asserts "[t]he multiple references to a public hearing in the statutes whose [*sic*] process was incorporated into Section 62757 demonstrates [*sic*] that the Legislature contemplated a process consistent with [the department's] long-standing history whenever significant changes were made to the Pooling Plan." Plaintiff ignores the language of the statute.

Plaintiff's overbroad interpretation as to the incorporated provisions of sections 62716 and 62717 renders meaningless the limiting language "approved by a statewide referendum of producers conducted pursuant to" the statutes, "violating the rule of statutory construction that, 'whenever possible, significance must be given to every word in pursuing the legislative purpose, and the court should avoid a construction that makes some words surplusage.' " (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 984 [exemption statutes did not incorporate all crimes specified in Pen. Code, § 667.5, subd. (c) because the statutes included the limiting language " 'crime against an individual,' " indicating only such crimes were incorporated].) Indeed, plaintiff's interpretation renders

12

the limiting language in section 62757, subdivision (c) superfluous. Had the Legislature intended to incorporate the entirety of sections 62716 and 62717, as plaintiff asserts, there would have been no need to include the "statewide referendum" limiting language in the subdivision. The limiting language used by the Legislature indicates it intended to incorporate only the procedures addressing the statewide referendum mentioned in sections 62716 and 62717, nothing more.

In the same vein, just as we do not delete words from a statute, we also do not add words to a statute. (*City and County of San Francisco v. International Union of Operating Engineers, Local 39* (2007) 151 Cal.App.4th 938, 945 ["[w]e may not add language to a statute that is not otherwise present"].) Section 62757 does not contain the word "hearing." The hearing references in the other statutes upon which plaintiff relies indicate that when the Legislature has intended to prescribe a hearing, it has done so expressly. (E.g., §§ 62704, 62705, 62717.) The absence of such an express requirement in section 62757 is instructive. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1395 [absence of express language used by the Legislature in other relevant statutes instructive].)

Plaintiff also ignores the language of section 62757 as it relates to section 62719. Section 62757, subdivision (c) states "[t]he stand-alone quota program shall be pursuant to a recommendation by the review board *established* pursuant to Section 62719." (Italics added.) The plain language of the statute indicates the Legislature merely intended to clarify that the "review board" it was referencing was the review board established under section 62719 and not a newly created or different board. Section 62757, subdivision (c) assigns to the review board the new task of making a recommendation regarding the establishment of a stand-alone quota program. Thus, we find no support for plaintiff's argument that the review board may only advise the department in the administration of a pooling plan established under chapter 3.

13

Finally, we turn to plaintiff's interpretation of section 62757, subdivision (a). Plaintiff argues "[t]he Legislature's repeated reference to 'the pooling plan' in Chapters 3.0 and 3.5 [of the Code] -- *41* times in the former, and *four* additional times in the latter (excluding Section 62757) -- resolves any doubt about its intent" in requiring in section 62757, subdivision (a) that the details of the stand-alone quota program "shall be included in the pooling plan." Plaintiff asserts the department does not and "cannot dispute that 'including' the [Quota Implementation Plan] in the pooling plan would require [the department] to amend the pooling plan. [The department] also do[es] not and cannot dispute that an amendment to the pooling plan would require [the department] to give notice and hold hearings pursuant to California Code of Regulations, Title 3, section 2080.4, only after which the producers would vote on the proposed amendment." The Legislature's use of the phrase "the pooling plan" is certainly ambiguous.

At first blush, plaintiff's interpretation -- that "the pooling plan" language in section 62757, subdivision (a) is synonymous with "the pooling plan" established under chapter 3 -- appears to harmonize statutes concerning the same general subject matter in the Code (i.e., milk marketing and pricing). (*People v. Shabazz* (2006) 38 Cal.4th 55, 67 [provisions relating to the same subject matter should be harmonized to the extent possible].) Upon a more thorough consideration of the whole statute, however, and after reading subdivisions (a) and (c) of section 62757 together, plaintiff's interpretation does not yield a reasonable result.

Interpreting section 62757, subdivision (a) as plaintiff does, there are two options for the scheme created by reading subdivisions (a) and (c) together. Either the stand-alone quota program had to be established pursuant to subdivision (c) of section 62757 before the details thereof could be included in the chapter 3 pooling plan via amendment, or the Legislature's intent was that the stand-alone quota program would be established by amending the pooling plan, the process of which would require a statewide referendum as provided in section 62717.

14

Starting with the second option first, we again run into the issue of surplusage discussed *ante*.  If the Legislature's intent was for the department to establish the stand-alone quota program *by amending the then-existing pooling plan*, there would have been no need for the Legislature to add subdivision (c) to section 62757.  That is because a substantive pooling plan amendment under chapter 3 already has a prescribed procedure -- requiring a public hearing and a statewide referendum.  (§ 62717.)  If the process of amending a pooling plan was intended to be the process by which to establish the stand-alone quota program, subdivision (c) of section 62757 would be superfluous.  Moreover, the procedure laid down in subdivision (c) of section 62757 is different than the pooling plan amendment procedure in section 62717, indicating the Legislature did not intend for section 62717 to govern the procedure for establishing the stand-alone quota program.

The first option also does not support plaintiff's interpretation because it leads to an absurd result.  If the Legislature intended for the department to initially establish the stand-alone quota program in accordance with subdivision (c) of section 62757 and to *thereafter* amend the then-existing pooling plan to include the details of the stand-alone quota program, the department would have been required to conduct *two* statewide referendums to approve *the same program*.  Section 62757, subdivision (c) requires the department to receive approval in a statewide referendum to establish the stand-alone quota program, and section 62717 provides substantive amendments to "the pooling plan" may only be made "if producers assent to the proposed amendments at a referendum conducted in the same manner and in the same number as provided for the referendum approving the pooling plan."  Such a scheme -- where an agency is required to conduct a statewide referendum for the same program twice -- is clearly illogical and could not have been contemplated by the Legislature.  Moreover, this scheme would require the department to conduct a public hearing *after* the stand-alone quota program was already approved by the producers in the first referendum, which is also illogical.

15

There is another factor militating against plaintiff's interpretation. Section 62757 is located in chapter 3.5, titled "milk pooling" (bolding and capitalization omitted) instead of chapter 3, titled "equalization pools" (bolding and capitalization omitted). When statutes in chapters *other than* chapter 3 have referred to "the pooling plan" or "a pooling plan" within the meaning of chapter 3, the Legislature has used chapter 3-specific language to signal the cross-reference. (See, e.g., §§ 61411.2 ["unless the milk is subject to a pooling plan as authorized in Chapter 3 (commencing with Section 62700) and the pooling plan provides . . ."], 62191, subd. (b)(4) [same], 62193, subd. (b) [same]; §§ 62146, subd. (c) ["Chapter 3 (commencing with Section 62700 or any pooling plan established thereunder"], 62149, subd. (d) [same], 62151, subd. (d) [same].) This is true of section 62750 in chapter 3.5 as well, which contains three "pooling plan" references and starts with "[n]otwithstanding any provision of Chapter 3 (commencing with Section 62700) in conflict with this section or any pooling plan for market milk in effect under that chapter . . . ." Although section 62756 in chapter 3.5 does not cross-reference chapter 3, the statute ties its "pooling plan" reference to a specific pooling plan previously in existence -- "[i]f the continued operation of this chapter is not approved, the secretary shall continue in operation the pooling plan in effect on December 31, 1993." The Legislature's decision to not cross-reference chapter 3 or identify a specific pooling plan previously in existence in section 62757 cuts against plaintiff's argument.

Because we agree the language in section 62757, subdivision (a) is ambiguous, we consider the legislative history and the context within which the statute was adopted to discern the statute's meaning. (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [" 'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' "].) The legislative history is sparse, and the Legislature made no amendments to the statute as introduced. We note, however, that the department sponsored and drafted the statute to conform to the language in the federal agency's Recommended Decision. We further note both

16

legislative committee reports[7] stated section 62757 was proposed because the federal agency issued the Recommended Decision and, if the federal agency promulgated the federal order, "the existing California pricing system (which includes the quota system) would be repealed." (Assem. Budget Subcom. No. 3 on Resources and Transportation, Rep. on Milk Pooling Trailer Bill Language, *supra*, pp. 41-42; Sen. Budget and Fiscal Review Subcom. No. 2, Rep. on Milk Pooling Trailer Bill Language, *supra*, p. 16.)

The Recommended Decision, in turn, proposed to add section 1051.11 to title 7 of the Code of Federal Regulations, stating: "*California Quota Program* means the applicable provisions of the California Food and Agriculture [*sic*] Code, and related provisions of the pooling plan administered by the [department]." (Recommended Decision, *supra*, 82 Fed.Reg. at 10684.) Although the federal agency noted the "California State Order" was "codified in the *Pooling Plan for Market Milk*, as amended, and in two *Stabilization and Marketing Plan(s) for Market Milk*, as amended, . . ." the language proposed for section 1051.11 to title 7 of the Code of Federal Regulations was "the pooling plan" and not "the *Pooling Plan for Market Milk*." (Recommended Decision, at 10639.) The federal agency further stated, "the California quota program should remain a function of [the department] in whatever manner [the department] deems appropriate." (*Id*. at 10634.)

---

**7**　" '[I]t is well established that reports of legislative committees and commissions are part of a statute's legislative history and may be considered when the meaning of a statute is uncertain.' " (*People v. Cruz* (1996) 13 Cal.4th 764, 773, fn. 5.) " 'The rationale for considering committee reports when interpreting statutes is similar to the rationale for considering voter materials when construing an initiative measure. In both cases it is reasonable to infer that those who actually voted on the proposed measure read and considered the materials presented in explanation of it, and that the materials therefore provide some indication of how the measure was understood at the time by those who voted to enact it.' " (*Ibid*.)

We glean from the language and location of the statute in the Code and the history and context surrounding its enactment that the Legislature's purpose in enacting section 62757 was to: (1) give the department the authority to establish and administer a stand-alone quota program under the anticipated circumstance that the federal order would suspend (§ 62726) or terminate (§ 62728) the then-existing milk pooling plan previously adopted under chapter 3;[8] (2) conform the language in section 62757 to the language proposed for section 1051.11 to title 7 of the Code of Federal Regulations in the Recommended Decision; and (3) prescribe the procedural requirements for adopting the stand-alone quota program.

"In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003.) With the foregoing in mind, we conclude the best and most reasonable interpretation of "the pooling plan" language in the statute in furtherance of the legislative intent, and the one that does no violence to the language of the statute itself or render any portion surplusage, is that the details of how the stand-alone quota program would be operated and implemented must be reduced to writing in a document deemed by the department and federal agency to be the pooling plan. The legislative history and historical context surrounding section 62757 indicate the phrase was not intended to have a technical meaning tied to chapter 3. The department considered the Quota Implementation Plan to be the pooling plan in the event the federal order was promulgated because it would work in tandem with the federal order, as provided in the Recommended Decision. This comported with the Legislature's intent.

---

[8] None of the statutes in chapter 3 mention repeal of a pooling plan.

18

That the Quota Implementation Plan is "the pooling plan" and contains only the details of the stand-alone quota program does not cut against our interpretation. The Legislature did not prescribe what the contents of the pooling plan had to include, other than the details of the stand-alone quota program (which includes the imposition of assessments that are pooled together to pay a premium to quota holders). Our interpretation also does not mean "the statute reads 'the secretary is authorized to establish a stand-alone quota program, the details of which shall be included in the stand-alone quota program,' " as plaintiff contends. As plaintiff notes, the words "program" and "plan" denote two different things. Under our interpretation, the program is the quota scheme funded by assessments whereas the plan is the written document that sets forth the details of how the quota scheme will be implemented and administered. Additionally, our interpretation does not mean "that *two* pooling plans were in existence in California for nearly a year -- the [Quota Implementation Plan], and the state Pooling Plan, which continued to govern until the [federal order] became effective," as plaintiff asserts. Both section 62757, subdivision (a) and the Quota Implementation Plan expressly state the stand-alone quota program would only go into effect if and when the federal agency promulgated a federal order, and the Quota Implementation Plan contains only the details of the stand-alone quota program.

We further find no merit in plaintiff's legislative history arguments. Plaintiff asserts Houston's testimony before the Assembly Budget Subcommittee No. 3 on Resources and Transportation on May 16, 2017, supports its position because Houston told the committee that section 62757 "was merely a clarification of existing law, ***with no change in policy***." In plaintiff's view, "that policy -- and any pre-existing authority -- ***required a hearing as a predicate to adopting the [quota plan]***." Plaintiff is mistaken. Houston said section 62757 was "really just a clarification of existing statute. Some other tidbits. The secretary is invested with significant administrative authority as the instrumentality of the state to administer and enforce the provisions of the pooling act. It

19

is the intent of the Legislature that the power conferred in this chapter shall be liberally construed. And my point -- those are in existing statute -- so my point is that we are not, in our opinion changing any policy. We are simply clarifying and making sure that it is certain to any future court that we have the authority to assess the producers and to use that to pay for quota." The policy to which Houston referred had to do with the department's authority to administer quota, it did not pertain to any procedural requirements.

Plaintiff's interpretation is also directly contradicted by Houston's further testimony, as follows: "So we want to use the Producer Review Board which is a statute [*sic*] and have that be a venue for the industry to talk about quota and to make recommendations. And then there's also a process currently in statute that the producers can then vote on that. So they would get together in the Producer Review Board, they would say, hey, this is how we want quota to run and then they would send it out to a referendum and the producers would vote and approve on, approve that. Our hope is that all of that would occur prior to their vote on a federal order which we think is [going to] be in Fall." Houston's testimony is consistent with the requirements set forth in section 62757, subdivision (c).

Plaintiff also relies on a question asked by an Assembly member during the legislative committee's hearing. The Assembly member's question as to the substantive or technical nature of the statute is not "a proper subject for consideration in determining the Legislature's intent." (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 701.)

In sum, we conclude section 62757 does *not* require the department to: (1) amend the previous California milk pooling plan adopted and implemented pursuant to chapter 3 to include the stand-alone quota program; or (2) conduct one or more public hearings prior to holding the referendum.

20

DISPOSITION

The judgment is affirmed. The department shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/s/
Robie, J.


We concur:


/s/
Hull, Acting P. J.


/s/
Krause, J.